# GEOFROY *v.* RIGGS.

APPEAL FROM THE SUPREME COURT OF THE DISTRICT OF COLUMBIA.

No. 1431. Submitted December 23, 1889.—Decided February 3, 1890.

A citizen of France can take land in the District of Columbia by descent from a citizen of the United States.

The treaty power of the United States extends to the protection to be afforded to citizens of a foreign country owning property in this country and to the manner in which that property may be transferred, devised or inherited.

The District of Columbia, as a political community, is one of "the States of the Union," within the meaning of that term as used in article 7 of the Consular Convention of February 23, 1853, with France.

Article 7 of the Convention with France of September 30, 1800, construed.

Article 7 of the Consular Convention with France of February 23, 1853, construed.

IN EQUITY. The bill alleged that the suit was "a purely friendly suit." The defendants demurred to the bill, and it was dismissed. The complainants appealed. The court stated the case as follows:

On the 19th day of January, 1888, T. Lawrason Riggs, a citizen of the United States and a resident of the District of Columbia, died at Washington, intestate, seized in fee of real estate of great value in the District. The complainants are citizens and residents of France and nephews of the deceased. On the 12th of March, 1872, the sister of the deceased, then named Kate S. Riggs, intermarried with Louis de Geofroy, of France. She was at the time a resident of the District of Columbia and a citizen of the United States. He was then and always has been a citizen of France. The complainants are the children of this marriage, and are infants now residing with their father in France. One of them was born July 14, 1873, at Pekin, in China, whilst his father was the French minister plenipotentiary to that country, and was there only as such minister. The other was born October 18, 1875, at Cannes, in France. Their mother, who was a sister of all the defendants except Medora, wife of the defendant E. Francis Riggs, died February 7, 1881. The deceased, T. Lawrason

Riggs, left one brother, E. Francis Riggs, and three sisters, Alice L. Riggs, Jane A. Riggs and Cecilia Howard, surviving him, but no descendants of any deceased brother or deceased sister, except the complainants.

The defendants, with the exception of Cecilia Howard, are, and always have been, citizens of the United States and residents of the District of Columbia. Cecilia Howard, in 1867, intermarried with Henry Howard, a British subject, and since that time has resided with him in England.

The real property described in the bill of complaint cannot be divided without actual loss and injury, and the interest of the complainants, if they have any, as well as of the defendants, in the property, would be promoted by its sale and a division of the proceeds.

To the bill of complaint setting up these facts and praying a sale of the premises described and a division of the proceeds among the parties to the suit according to their respective rights and interests, the defendants demurred, on the ground that the complainants were incapable of inheriting from their uncle any interest in the real estate. The Supreme Court of the District of Columbia sustained the demurrer and dismissed the bill. From the decree the case is brought to this court on appeal.

*Mr. J. Hubley Ashton* for appellants.

*Mr. John Selden* for appellees.

As the Treaty of Amity and Commerce concluded between the Thirteen United States of North America and France, on February 6, 1778, was annulled by act of Congress, July 1, 1798, 1 Stat. 578, c. 67, and as the Convention of Peace, Commerce and Navigation concluded between the United States and France, on September 30, 1800, expired by its own limitation, eight years afterwards, in pursuance of an additional article, (Pub. Treaties, ed. 1875, p. 232,) inserted by the Senate, on February 4, 1801: *Chirac* v. *Chirac*, 2 Wheat. 259, 272, 277; *Carneal* v. *Banks,* 10 Wheat. 181, 189; *Buchanan* v. *Deshon,* 1 Har. & G. 280; the single *treaty stipulation*

which can be supposed to operate upon the capacity of French citizens to inherit lands in the United States, must be found in article 7 of the Consular Convention concluded between this country and France, on the 23d day of February, 1853.[1]

But the operation prescribed for this article, (so far as the same becomes material in the present controversy,) is limited, by the terms of the article, to " *the States* of the Union." By this language, the members of the Union become distinguished, at once, from the republic they compose. And that neither the District of Columbia, nor a Territory of the United States, falls within the definition of a *State*, as that term is employed in the Constitution, or in the Acts of Congress, has long been familiar to all. *Hepburn* v. *Ellzey*, 2 Cranch, 445 ; *New Orleans* v. *Winter*, 1 Wheat. 94 ; *Barney* v. *Baltimore*, 6 Wall. 287 ; *Jost* v. *Jost*, 1 Mackey, 487.

Between the *United States*, as an integral government, country, or nation, and the *several States* constituting our Union, a distinction is admitted and maintained throughout our convention with France. If the parties to the convention have actually limited the operation of this article to the *States* of the Union, it cannot be necessary to investigate their reasons for establishing that restriction.

The concessions, on the part of the United States, expressed in this article of the convention are : (1) The adoption, as part of the supreme law of the land, of certain existing *state* laws, so long as they may remain in operation ; and (2) the engagement of the President, to recommend to those States, by whose laws aliens are not permitted to hold real estate, the passage of enabling enactments.

They are not the obligations that would be assumed by the United States, when entering into treaty engagements affecting either the *Territories*, respecting which Congress may make all needful rules and regulations, or the *District of Columbia*, over which Congress may, in all cases whatsoever, exercise exclusive legislation.

They are the stipulations of the United States in relation to subjects over which the laws of the several States are recog-

---

[1] This article will be found in the opinion of the court, *post*, 268.

nized as supreme. And these stipulations cease to be applicable or operative, where the legislative power of the Union becomes, under the Constitution, paramount and peculiar.

That such was the contemporaneous construction placed by the United States upon this article of the treaty, is shown from the Circular Letter addressed by Secretary Marcy,[1] October 19, 1853, to the governors of the several States, and the omission of the President to recommend to Congress any legislation on the subject. The laws of the several States, as those laws existed at the date of the convention, may be supposed to have been susceptible, in general, of easy ascertainment and comparison.

Before proceeding, in the next branch of the argument, to examine the local law on the subject, certain positions taken by the appellants may be noticed here.

An ingenious interpretation is sought to be given to the treaty, by so transposing its terms, as to require the word " it," where first occurring in the 1st clause of the 7th article, to refer and apply to the whole of the next following clause in the same article.

But as the language of the article remains free from ambiguity, when read in the order in which the two clauses are actually found to occur, they cannot be dislocated or inverted for the purpose of creating a meaning for that language. *Doe* v. *Considine*, 6 Wall. 458.

---

[1] DEPARTMENT OF STATE.
WASHINGTON. *October* 19, 1853.

*To his Excellency the Governor of* ——

Sir: I have the honor to transmit to your Excellency a copy of the Consular Convention of the 23rd February last between the United States and France, and to invite your Excellency's attention to the second paragraph of the seventh article. Pursuant to the stipulation therein contained, the President engages to recommend to those States of the Union, by whose laws aliens are not permitted to hold real estate, the passage of such laws as may be necessary for the purpose of conferring that right. In accordance with the stipulation adverted to, the President directs me to communicate to your Excellency his recommendation that if, pursuant to existing laws, French subjects shall not be allowed to hold real estate in that right may by law be conferred upon them.

I have the honor to be, etc., W. L. MARCY.

It is insisted that upon the construction placed by the appellees upon this article of the treaty, the citizens of France were left without benefit from the compact. But if France received no advantage from the article, she at least yielded nothing by adopting it.

Under the provisions of the Code Napoleon, the citizen of another country had been exempted from the *droit d'aubaine*, in France, only when by treaty between the two nations, the French citizen had been thus relieved in the foreign country.

By the law of July 14, 1819, however, these provisions were abolished, and the capacity of aliens to acquire, hold and transmit real and personal estate was rendered — as it still remains — that of French citizens.

The privileges conferred by the 7th article of the treaty upon citizens of the United States were, therefore, no greater than those which were conceded under the general law of France, at the date of the treaty.

"The ulterior right of establishing reciprocity," reserved in the third clause of the article, enabled the government of France to impose, at its discretion, upon citizens of the United States, such incapacities as might be laid, in our own country, upon citizens of France, under the laws of the States, Territories or District of Columbia.

Hence, if, by reason of those laws, the citizens of France derived no advantage from the article, none could continue to accrue — except by the sufferance of that country — to citizens of the United States.

Were it conceded that the words, "States of the Union," as employed in article 7 of the convention, properly embrace the District of Columbia, it would still be essential for the appellants, in order to entitle them to the protection of the article, to establish the existence within the district, both at the date of the convention and at the time of the death of their ancestor, of some law whereby French citizens or subjects, residing in France, had been rendered competent to take lands, by descent, from a citizen of the United States.

*By the common law*, as the same was transplanted into Maryland, the alien was excluded from the acquisition of land

by descent. *Buchanan* v. *Deshon*, 1 Har. & G. 280, 289; *Guyer's Lessee* v. *Smith*, 22 Maryland, 239.; *S. C.* 85 Am. Dec. 650.

The act of Maryland of December 19,.1791, ratifying her cession to the United States, provides, in effect, in its 6th section, that "*any foreigner*" may, by *deed* or *will*, take and hold lands within the ceded territory, and such land may be conveyed by him, and be transmitted to and inherited by his heirs and relations, as if he and they were citizens of Maryland. It has long been settled, however, that these provisions do not remove the disability, arising from common law principles, of an alien to *inherit* lands lying in this District *from a citizen* thereof. *Spratt* v. *Spratt*, 1 Pet. 343; *Spratt* v. *Spratt*, 4 Pet. 393; *Jost* v. *Jost*, 1 Mackey, 493.

Nor are the restrictions and disabilities removed by the act of March 3, 1887, 24 Stat. 476, c. 340.

A later statute which does not expressly repeal, in whole or in part, any previous legislation upon the subject to which it relates, cannot be viewed as wholly superseding such legislation by substitution, revision or otherwise, unless the new statute either embraces, in itself, the entire field covered by former enactments, or manifests a plain intention to furnish, *per se*, a new and exclusive system upon the subject to which they refer. *United States* v. *Tynen*, 11 Wall. 88, 92; *Henderson's Tobacco*, 11 Wall. 652; *Murdock* v. *Memphis*, 20 Wall. 590, 617; *King* v. *Cornell*, 106 U. S. 395; *Red Rock* v. *Henry*, 106 U. S. 596; *Cook County Nat. Bank* v. *United States*, 107 U. S. 445; *Pana* v. *Bowler*, 107 U. S. 529.

The basis, it is evident, of this proposition, is that repeals by implication are not to be favored; that they are founded upon the repugnance which arises between the new law and the old; and that the extent of such repugnance is the measure of such repeals. *Arthur* v. *Homer*, 96 U. S. 137; *Ex parte Crow Dog*, 109 U. S. 556; *Chew Heong* v. *United States*, 112 U. S. 536; *United States* v. *Langston*, 118 U. S. 389; *Chicago Railway Co.* v. *United States*, 127 U. S. 406.

The act, in its title, is "An Act to *restrict* the ownership of

real estate in the Territories to American citizens, and so forth." It contains no repealing clause.

The language of the first three sections is the language of *prohibition*. It is to the "violation of the provisions" in those sections that the penal clauses of the fourth section apply.

And as titles by *inheritance* are excepted from its prohibitions, the act, as to such titles, is neither penal nor inhibitory. Titles by inheritance being thus exempted from the prohibitions of the section, to such titles the act is without application; and they are to be regulated by the laws in force at the time of the passage of the act.

Mr. Justice Field, after stating the case, delivered the opinion of the court.

The complainants are both citizens of France. The fact that one of them was born in Pekin, China, does not change his citizenship. His father was a Frenchman, and by the law of France a child of a Frenchman, though born in a foreign country, retains the citizenship of his father. In this case, also, his father was engaged, at the time of the son's birth, in the diplomatic service of France, being its minister plenipotentiary to China, and by public law the children of ambassadors and ministers accredited to another country retain the citizenship of their father.

The question presented for solution, therefore, is whether the complainants, being citizens and residents of France, inherit an interest in the real estate in the District of Columbia of which their uncle, a citizen of the United States and a resident of the District, died seized. In more general terms the question is: can citizens of France take land in the District of Columbia by descent from citizens of the United States?

The complainants contend that they inherit an estate in the property described, by force of the stipulation of article 7 of the convention between the United States and France, concluded February 23, 1853, and the provisions of the act of Congress of March 3, 1887, to restrict the ownership of real estate in the Territories to American citizens. Before consid-

ering the effect of this article and of the act of 1887, a brief reference will be had to the laws of Maryland in force on the 27th of February, 1801, which were on that day declared by act of Congress to be in force in the District of Columbia. The language of the act is "that the laws of the State of Maryland *as they now exist* shall be and continue in force in that part of the said District which was ceded by that State to the United States, and by them accepted." 2 Stat. 103, c. 15, § 1.

A part of these laws was the common law, and two acts of Maryland, one passed in March, 1780, "to declare and ascertain the privileges of the subjects of France" within that State; the other, passed December 19, 1791, to ratify her cession to the United States, entitled "An Act concerning the Territory of Columbia and the City of Washington." The common law, unmodified by statute or treaty, would have excluded aliens from inheriting lands in the United States from a citizen thereof. Its doctrine is that aliens have no inheritable blood through which a title can be transferred by operation of law. The act of Maryland of 1780 modified that law so far as to allow a subject of France who had settled in that State, and given assurances of allegiance and attachment to it as required of citizens, to devise to French subjects, who for that purpose were to be deemed citizens of the State. Act of March, 1780, c. 8, § 5, 1 Dorsey's Laws of Maryland, 158. It also provided that if the decedent died intestate his natural kindred, whether residing in France or elsewhere, should inherit his real estate in like manner as if such decedent and his kindred were citizens of the United States. It had no bearing, however, upon the inheritance of a subject of France, except from a Frenchman domiciled in the State. The act of Maryland of December 19, 1791, which provided in its sixth section that any foreigner might, by deed or will thereafter made, take and hold lands within the State in the same manner as if he were a citizen thereof, and that the lands might be conveyed by him, and transmitted to and inherited by his heirs and relations as if he and they were citizens of the State, did not do away with the disability of foreigners to take real

property within that State by inheritance from a citizen of the United States. It was so held in effect in *Spratt* v. *Spratt*, 1 Pet. 343; *S. C.* 4 Pet. 393.

On the 30th of September, 1800, a convention of peace, commerce and navigation was concluded between France and the United States, the 7th article of which provided that " the citizens and inhabitants of the United States shall be at liberty to dispose by testament, donation or otherwise, of their goods, movable and immovable, holden in the territory of the French Republic in Europe, and the citizens of the French Republic shall have the same liberty with regard to goods movable and immovable, holden in the territory of the United States, in favor of such persons as they shall think proper. The citizens and inhabitants of either of the two countries, who shall be heirs of goods, movable or immovable, in the other, shall be able to succeed *ab intestato*, without being obliged to obtain letters of naturalization, and without having the effect of this provision contested or impeded under any pretext whatever." 8 Stat. 182.

This article, by its terms, suspended, during the existence of the treaty, the provisions of the common law of Maryland and of the statutes of that State of 1780 and of 1791, so far as they prevented citizens of France from taking by inheritance from citizens of the United States, property, real or personal, situated therein.

That the treaty power of the United States extends to all proper subjects of negotiation between our government and the governments of other nations, is clear. It is also clear that the protection which should be afforded to the citizens of one country owning property in another, and the manner in which that property may be transferred, devised or inherited, are fitting subjects for such negotiation and of regulation by mutual stipulations between the two countries. As commercial intercourse increases between different countries the residence of citizens of one country within the territory of the other naturally follows, and the removal of their disability from alienage to hold, transfer and inherit property in such cases tends to promote amicable relations. Such removal has

been within the present century the frequent subject of treaty arrangement. The treaty power, as expressed in the Constitution, is in terms unlimited except by those restraints which are found in that instrument against the action of the government or of its departments, and those arising from the nature of the government itself and of that of the States. It would not be contended that it extends so far as to authorize what the Constitution forbids, or a change in the character of the government or in that of one of the States, or a cession of any portion of the territory of the latter, without its consent. *Fort Leavenworth Railroad Co.* v. *Lowe*, 114 U. S. 525, 541. But with these exceptions, it is not perceived that there is any limit to the questions which can be adjusted touching any matter which is properly the subject of negotiation with a foreign country. *Ware* v. *Hylton*, 3 Dall. 199; *Chirac* v. *Chirac*, 2 Wheat. 259; *Hauenstein* v. *Lynham*, 100 U. S. 483; 8 Opinions Attys. Gen. 417; *The People* v. *Gerke*, 5 California, 381.

Article 7 of the convention of 1800 was in force when the act of Congress adopting the laws of Maryland, February 27, 1801, was passed. That law adopted and continued in force the law of Maryland as it then existed. It did not adopt the law of Maryland as it existed previous to the treaty; for that would have been in effect to repeal the treaty so far as the District of Columbia was affected. In adopting it as it *then existed*, it adopted the law with its provisions suspended during the continuance of the treaty so far as they conflicted with it — in other words, the treaty, being part of the supreme law of the land, controlled the statute and common law of Maryland whenever it differed from them. The treaty expired by its own limitation in eight years, pursuant to an article inserted by the Senate. 8 Stat. 192. During its continuance citizens of France could take property in the District of Columbia by inheritance from citizens of the United States. But after its expiration that right was limited as provided by the statute and common law of Maryland, as adopted by Congress on the 27th of February, 1801, until the convention between the United States and France was concluded, February 23, 1853. The 7th article of that convention is as follows:

"In all the States of the Union, whose existing laws permit it, so long and to the same extent as the said laws shall remain in force, Frenchmen shall enjoy the right of possessing personal and real property by the same title and in the same manner as the citizens of the United States. They shall be free to dispose of it as they may please, either gratuitously or for value received, by donation, testament, or otherwise, just as those citizens themselves; and in no case shall they be subjected to taxes on transfer, inheritance, or any others different from those paid by the latter, or to taxes which shall not be equally imposed.

"As to the States of the Union, by whose existing laws aliens are not permitted to hold real estate, the President engages to recommend to them the passage of such laws as may be necessary for the purpose of conferring this right.

"In like manner, but with the reservation of the ulterior right of establishing reciprocity in regard to possession and inheritance, the government of France accords to the citizens of the United States the same rights within its territory in respect to real and personal property, and to inheritance, as are enjoyed there by its own citizens." 10 Stat. 996.

This article is not happily drawn. It leaves in doubt what is meant by " States of the Union." Ordinarily these terms would be held to apply to those political communities exercising various attributes of sovereignty which compose the United States, as distinguished from the organized municipalities known as Territories and the District of Columbia. And yet separate communities, with an independent local government, are often described as states, though the extent of their political sovereignty be limited by relations to a more general government or to other countries. Halleck on Int. Law, c. 3, §§ 5, 6, 7. The term is used in general jurisprudence and by writers on public law as denoting organized political societies with an established government. Within this definition the District of Columbia, under the government of the United States, is as much a State as any of those political communities which compose the United States. Were there no other territory under the government of the United States, it would

not be questioned that the District of Columbia would be a State within the meaning of international law; and it is not perceived that it is any less a State within that meaning because other States and other territory are also under the same government. In *Hepburn* v. *Ellzey*, 2 Cranch, 445, 452, the question arose whether a resident and a citizen of the District of Columbia could sue a citizen of Virginia in the Circuit Court of the United States. The court, by Chief Justice Marshall, in deciding the question, conceded that the District of Columbia was a distinct political society, and therefore a State according to the definition of writers on general law; but held that the act of Congress in providing for controversies between citizens of different States in the Circuit Courts, referred to that term as used in the Constitution, and therefore to one of the States composing the United States. A similar concession, that the District of Columbia, being a separate political community, is, in a certain sense, a State, is made by this court in the recent case of *Metropolitan Railroad Co.* v. *District of Columbia*, 132 U. S. 1, 9, decided at the present term.

Aside from the question in which of these significations the terms are used in the convention of 1853, we think the construction of article 7 is free from difficulty. In some States aliens were permitted to hold real estate, but not to take by inheritance. To this right to hold real estate in some States reference is had by the words "permit it" in the first clause, and it is alluded to in the second clause as not permitted in others. This will be manifest if we read the second clause before the first. This construction, as well observed by counsel, gives consistency and harmony to all the provisions of the article, and comports with its character as an agreement intended to confer reciprocal rights on the citizens of each country with respect to property held by them within the territory of the other. To construe the first clause as providing that Frenchmen shall enjoy the right of possessing personal and real property by the same title and in the same manner as citizens of the United States, in States, so long as their laws permit such enjoyment, is to give a meaning to the article by

which nothing is conferred not already possessed, and leaves no adequate reason for the concession by France of rights to citizens of the United States, made in the third clause. We do not think this construction admissible. It is a rule, in construing treaties as well as laws, to give a sensible meaning to all their provisions if that be practicable. "The interpretation, therefore," says Vattel, "which would render a treaty null and inefficient cannot be admitted;" and again, "it ought to be interpreted in such a manner as that it may have its effect, and not prove vain and nugatory." [1] Vattel, Book II, c. 17. As we read the article it declares that in all the States of the Union by whose laws aliens are permitted to hold real estate, so long as such laws remain in force, Frenchmen shall enjoy the right of possessing personal and real property by the same title and in the same manner as citizens of the United States. They shall be free to dispose of it as they may please — by donation, testament, or otherwise — just as those citizens themselves. But as to the States by whose existing laws aliens are not permitted to hold real estate, the treaty engages that the President shall recommend to them the passage of such laws as may be necessary for the purpose of conferring that right.

In determining the question in what sense the terms "States of the Union" are used, it is to be borne in mind that the laws of the District and of some of the Territories, existing at the time the convention was concluded in 1853, allowed aliens to hold real estate. If, therefore, these terms are held to exclude those political communities, our government is placed in a very inconsistent position — stipulating that citizens of France shall enjoy the right of holding, disposing of, and inheriting, in like manner as citizens of the United States, property, real and personal, in those States whose laws permit aliens to hold real estate; that is, that in those States citizens of France, in holding, disposing of, and inheriting property, shall be free

---

[1] "L'interprétation qui rendrait un acte nul et sans effet, ne peut donc être admise. . . . Il faut l'interpréter de manière qu'il puisse avoir son effet, qu'il ne se trouve pas vain et illusoire." 2 Droit des Gens, 265, édition Paris, 1863, par Pradier-Fodéré.

from the disability of alienage; and, in order that they may in like manner be free from such disability in those States whose existing laws do not permit aliens to hold real estate, engaging that the President shall recommend the passage of laws conferring that right; while, at the same time, refusing to citizens of France holding property in the District and in some of the Territories, where the power of the United States is in that respect unlimited, a like release from the disability of alienage, thus discriminating against them in favor of citizens of France holding property in States having similar legislation. No plausible motive can be assigned for such discrimination. A right which the government of the United States apparently desires that citizens of France should enjoy in all the States, it would hardly refuse to them in the District embracing its capital, or in any of its own territorial dependencies. By the last clause of the article the government of France accords to the citizens of the United States the same rights within its territory in respect to real and personal property and to inheritance as are enjoyed there by its own citizens. There is no limitation as to the territory of France in which the right of inheritance is conceded. And it declares that this right is given in like manner as the right is given by the government of the United States to citizens of France. To ensure reciprocity in the terms of the treaty, it would be necessary to hold that by "States of the Union" is meant all the political communities exercising legislative powers in the country, embracing not only those political communities which constitute the United States, but also those communities which constitute the political bodies known as Territories and the District of Columbia. It is a general principle of construction with respect to treaties that they shall be liberally construed, so as to carry out the apparent intention of the parties to secure equality and reciprocity between them. As they are contracts between independent nations, in their construction words are to be taken in their ordinary meaning, as understood in the public law of nations, and not in any artificial or special sense impressed upon them by local law, unless such restricted sense is clearly intended. And it has been held by this court that

where a treaty admits of two constructions, one restrictive of rights that may be claimed under it and the other favorable to them, the latter is to be preferred. *Hauenstein* v. *Lynham,* 100 U. S. 483, 487. The stipulation that the government of France in like manner accords to the citizens of the United States the same rights within its territory in respect to real and personal property and inheritance as are enjoyed there by its own citizens, indicates that that government considered that similar rights were extended to its citizens within the territory of the United States, whatever the designation given to their different political communities.

We are, therefore, of opinion that this is the meaning of the article in question—that there shall be reciprocity in respect to the acquisition and inheritance of property in one country by the citizens of the other, that is, in all political communities in the United States where legislation permits aliens to hold real estate, the disability of Frenchmen from alienage in disposing and inheriting property, real and personal, is removed, and the same right, of disposition and inheritance of property, in France, is accorded to citizens of the United States, as are there enjoyed by its own citizens. This construction finds support in the first section of the act of March 3d, 1887. 24 Stat. 476, c. 340. That section declares that it shall be unlawful for any person or persons not citizens of the United States, or who have not declared their intention to become citizens, to thereafter acquire, hold or own real estate, or any interest therein, in any of the Territories of the United States or in the District of Columbia, except such as may be acquired by inheritance or in good faith in the ordinary course of justice in the collection of debts previously created. There is here a plain implication that property in the District of Columbia and in the Territories may be acquired by aliens by inheritance under existing laws; and no property could be acquired by them in the District by inheritance except by virtue of the law of Maryland as it existed when adopted by the United States during the existence of the convention of 1800 or under the 7th article of the convention of 1853. Our conclusion is, that the complainants are entitled to take by

inheritance an interest in the real property in the District of Columbia of which their uncle died seized. The decree of the court below will, therefore, be

*Reversed and the cause remanded, with direction to overrule the demurrer of the defendants; and it is so ordered.*