**In re NAKA'S LICENSE.**

No. C-636.

District Court of Alaska. Third Division. Valdez.

Nov. 5, 1934.

2

Warren Taylor, Asst. U. S. Dist. Atty., of Kodiak, for petitioner.

Joseph Murray, of Cordova, for respondent.

HELLENTHAL, District Judge.

The petitioner alleges that on the 14th day of September, 1934, a restaurant beer and wine license was issued to R. Naka, under Section 2 of Chapter 71, Session Laws of Alaska for 1933; that R. Naka is a subject of the Empire of Japan, and is not a citizen of the United States of Ameri-

ca; that said license was issued and is in violation of Section 1 of said act; and prays that an order to show cause be issued requiring said R. Naka to show cause, if any, why said license should not be revoked, and for other and further relief.

The respondent alleges that he, R. Naka, is a subject of the Empire of Japan and that the license granted is now a vested right of the said R. Naka under the treaty between Japan and the United States, filed February 21, 1911, ratified March 2, 1911, promulgated April 5, 1911, 37 Stat. 1504, and now in force; that the petition herein is in the nature of a prosecution growing out of the revenue laws and must be prosecuted by the Territory of Alaska; that the cause is a civil action and the Territory of Alaska is the only interested party; that no such proceeding is contemplated under said laws; that the making of the transfer of the license in question was not a judicial act and therefore that the court has no inherent power over the same; and lastly that the petition be dismissed upon the ground that the transfer of said license to a Japanese subject was legally made under the solemn provisions of the above-referred to treaty.

At said hearing it was agreed that the appearance filed by the respondent, called a special appearance, was in fact an answer to the petition. Whereupon the respondent introduced the original application made in the above matter to have the beer and wine license previously held by Peggy O'Day transferred to R. Naka. The above mentioned application was the only evidence offered, whereupon counsel argued the issued raised.

The application for transfer states all the requirements of an original application for a license, except that the words "a citizen of the United States * * * and is a qualified elector of the Territory of Alaska" were stricken and the phrase "I am a subject of the Empire of Japan" was added to the affidavit, and a further affidavit was attached to the application which contains the following: "I

have been informed and believe and therefore allege, that even though I am not a citizen, that I am entitled to a beer and wine license under a treaty entered into between the United States of America and the Empire of Japan, the date of which I do not know. I urge my rights under said treaty because I am a subject of the Japanese Empire."

Section 1, of Chapter 71, Alaska Session Laws of 1933 provides: "That it shall be unlawful for any person, firm or corporation to manufacture, bottle or sell beer or wine within the Territory of Alaska without first having obtained a license to do so. Licenses shall be issued only for permanent established places in suitable locations and to persons of good moral character who are citizens of the United States and who are qualified electors of the Territory of Alaska."

Under Section 2, a beer and wine license may be obtained by a person qualified under the provisions of the act upon the payment of a license fee of $50 per annum. Such a beer and wine license gives the holder thereof the right and privilege of selling beer and wine in a restaurant to be consumed with meals furnished in good faith to patrons.

Section 13 provides that a person desiring a license shall make application therefor to the District Court in the Division in which such business is to be conducted upon forms to be provided by the Territorial Treasurer; that before such license is issued the judge of the District Court shall satisfy himself of the moral character and financial responsibility of the applicant and generally of the applicant's fitness for the trust to be in him reposed. The section then provides, among other things, that the application, if of an individual, must contain a statement that the applicant is a citizen of the United States and a qualified elector of the Territory of Alaska.

Section 14 of said Act is as follows: "Proceedings for the revocation of any license for any false statement in any application for license hereunder or for any other violation of this Act may be commenced, by the filing of an appro-

priate action in the District Court of the Division in which such license was granted, by the United States Attorney for such Division."

It is urged that the proceedings herein are not properly brought and that the court has no jurisdiction to revoke the license under consideration. We do not think that these objections can be maintained in view of the provisions of Section 14, heretofore quoted, which provides that proceedings in the District Court for the revocation of any license may be maintained for a false statement made in the application or for any other violation of the act. Surely a license issued to a person who is not entitled to the same by reason of the fact that he is not a citizen or an elector is a license issued in violation of the act, and all commodities sold under such a license are sold in violation of this act. The District Court is given express power by said act to maintain and determine such matters.

There are many other objections urged in the answer herein, but no purpose is served by referring to them in detail. It is maintained that a Japanese subject has the same right to have a beer and wine license issued to him as a citizen of the United States has, by virtue of that certain treaty entered into between the United States and the Empire of Japan hereinbefore referred to, which said treaty, as far as the same relates to the matter under consideration, is as follows:

"Article I. The citizens or subjects of each of the High Contracting Parties shall have liberty to enter, travel and reside in the territories of the other to carry on trade, wholesale and retail, to own or lease and occupy houses, manufactories, warehouses and shops, to employ agents of their choice, to lease land for residential and commercial purposes, and generally to do anything incident to or necessary for trade upon the same terms as native citizens or subjects, submitting themselves to the laws and regulations there established. * * *

"The citizens or subjects of each of the High Contracting Parties shall receive, in the territories of the other, the most constant protection and security for their persons and property, and shall enjoy in this respect the same rights and privileges as are or may be granted to native citizens or subjects, on their submitting themselves to the conditions imposed upon the native citizens or subjects. * * * ."

Since the selling of beer or wine by a Japanese subject under the act of the Territorial Legislature is clearly carrying on a trade, it becomes necessary to determine the meaning of the term "trade" as used in the treaty, whether the term is used in a restricted sense meaning useful trade and does not include a trade such as the selling of intoxicating liquors, which has been regulated, restricted and sometimes prohibited under the police power. If the term "trade" in the treaty is used in this restricted sense, then the license was issued in violation of law and should be revoked. If the term "trade" is used in the ordinary sense and includes trade that has been regulated and restricted, the treaty gives a Japanese subject the same right as a citizen voter has and therefore the license was rightfully issued and the petition should be dismissed.

The sale of intoxicating liquor is a business or trade that can be and has been regulated, restricted and prohibited under the police power and is not a useful business or trade.

Crowley v. Christensen, 137 U.S. 86, 11 S.Ct. 13, 15, 34 L.Ed. 620, holds: "There is in this position an assumption of a fact which does not exist,—that, when the liquors are taken in excess, the injuries are confined to the party offending. The injury, it is true, first falls upon him in his health, which the habit undermines; in his morals, which it weakens; and in the self-abasement which it creates. But, as it leads to neglect of business and waste of property, and general demoralization, it affects those who are immediately connected with and dependent upon him. By the general concurrence of opinion of every civilized and

Christian community, there are few sources of crime and misery to society equal to the dram-shop, where intoxicating liquors, in small quantities, to be drunk at the time, are sold indiscriminately to all parties applying. The statistics of every state show a greater amount of crime and misery attributable to the use of ardent spirits obtained at these retail liquor saloons than to any other source. The sale of such liquors in this way has therefore been, at all times, by the courts of every state considered as the proper subject of legislative regulation. Not only may a license be exacted from the keeper of the saloon before a glass of his liquors can be thus disposed of, but restrictions may be imposed as to the class of persons to whom they may be sold, and the hours of the day, and the days of the week, on which the saloons may be opened. Their sale in that form may be absolutely prohibited. It is a question of public expediency and public morality, and not of federal law. The police power of the state is fully competent to regulate the business, to mitigate its evils, or to suppress it entirely. There is no inherent right in a citizen to thus sell intoxicating liquors by retail. It is not a privilege of a citizen of the state or of a citizen of the United States. As it is a business attended with danger to the community, it may, as already said, be entirely prohibited, or be permitted under such conditions as will limit to the utmost its evils. The manner and extent of regulation rest in the discretion of the governing authority."

The decisions under the Fourteenth Amendment relating to discrimination make a distinction between a useful trade or business and a trade or business that is not in itself useful.

Yick Wo v. Hopkins, 118 U.S. 356, 6 S.Ct. 1064, 1073, 30 L.Ed. 220, holds: That excluding Chinese as a class from the laundry, a useful, business, was a violation of the Fourteenth Amendment.

"No reason for it is shown, and the conclusion cannot be resisted that no reason for it exists except hostility to the

race and nationality to which the petitioners belong, and which, in the eye of the law, is not justified. The discrimination is therefore illegal, and the public administration which enforces it is a denial of the equal protection of the laws, and a violation of the fourteenth amendment of the constitution."

Truax v. Raich, 239 U.S. 33, 36 S.Ct. 7, 10, 60 L.Ed. 131, L.R.A.1916D, 545, Ann.Cas.1917B, 283, holds: That a law excluding foreigners, as a class, from lawful employment is in violation of the Fourteenth Amendment.

"It is sought to justify this act as an exercise of the power of the state to make reasonable classifications in legislating to promote the health, safety, morals, and welfare of those within its jurisdiction. But this admitted authority, with the broad range of legislative discretion that it implies, does not go so far as to make it possible for the state to deny to lawful inhabitants, because of their race or nationality, the ordinary means of earning a livelihood. * * * If this could be refused solely upon the ground of race or nationality, the prohibition of the denial to any person of the equal protection of the laws would be a barren form of words. It is no answer to say, as it is argued, that the act proceeds upon the assumption that 'the employment of aliens, unless restrained, was a peril to the public welfare.' The discrimination against aliens in the wide range of employments to which the act relates is made an end in itself, and thus the authority to deny to aliens, upon the mere fact of their alienage, the right to obtain support in the ordinary fields of labor, is necessarily involved. * * *

"The question of rights under treaties was not expressly presented by the bill, and, although mentioned in the argument, does not require attention, in view of the invalidity of the act under the 14th Amendment."

Clarke v. Deckebach, 274 U.S. 392, 393, 47 S.Ct. 630, 631, 71 L.Ed. 1115, holds: Legislation prohibiting foreigners, as a class, from conducting pool rooms, which it

holds have harmful and vicious tendencies, does not violate the Fourteenth Amendment.

"The admitted allegations of the answer set up the harmful and vicious tendencies of public billiard and pool rooms, of which this court took judicial notice in Murphy v. California, 225 U.S. 623, 32 S.Ct. 697, 56 L.Ed. 1229, 41 L.R. A.(N.S.) 153. The regulation or even prohibition of the business is not forbidden. Murphy v. California, supra. The present regulation presupposes that aliens in Cincinnati are not as well qualified as citizens to engage in this business. It is not necessary that we be satisfied that this premise is well founded in experience. We cannot say that the city council gave unreasonable weight to the view admitted by the pleadings that the associations, experiences and interests of members of the class disqualified the class as a whole from conducting a business of dangerous tendencies.

"It is enough for present purposes that the ordinance, in the light of facts admitted or generally assumed, does not preclude the possibility of a rational basis for the legislative judgment and that we have no such knowledge of local conditions as would enable us to say that it is clearly wrong. Fort Smith Light & Traction Co. v. Board of Improvement, 274 U.S. 387, 47 S.Ct. 595, 71 L.Ed. 1112.

"Some latitude must be allowed for the legislative appraisement of local conditions, Patsone v. Pennsylvania, supra [232 U.S. 138], 144 (34 S.Ct. 281 [58 L.Ed. 539]; Adams v. Milwaukee, 228 U.S. 572, 583, 33 S.Ct. 610, 57 L.Ed. 971, and for the legislative choice of methods for controlling an apprehended evil. It was competent for the city to make such a choice, not shown to be irrational, by excluding from the conduct of a dubious business and entire class rather than its objectionable members selected by more empirical methods. See Westfall v. United States, 274 U.S. 256, 47 S.Ct. 629, 71 L.Ed. 1036."

■ The foregoing cases hold that foreigners cannot be discriminated against in conducting laundries or prevented from engaging in useful occupations under the Fourteenth

Amendment, but that the courts will not disturb a classification made in regard to a business that is harmful and vicious in itself, even if it does affect foreigners, as a class under the Fourteenth Amendment.

Asakura v. Seattle, 265 U.S. 332, 44 S.Ct. 515, 516, 68 L.Ed. 1041: In this case the court in construing the same treaty which is involved in the present case holds that in construing treaties a broad and liberal construction is to be given to the wording of the treaty and that the term "trade" as used in said treaty includes the business of a pawnbroker. The court say: "It remains to be considered whether the business of pawnbroker is 'trade' within the meaning of the treaty. Treaties are to be construed in a broad and liberal spirit, and, when two constructions are possible, one restrictive of rights that may be claimed under it and the other favorable to them, the latter is to be preferred. Hauenstein v. Lynham, 100 U.S. 483, 487, 25 L.Ed. 628; [De] Geofroy v. Riggs, supra [133 U.S. 258] 271, (10 S.Ct. 295) [33 L.Ed. 642]; Tucker v. Alexandroff, 183 U.S. 424, 437, 22 S.Ct. 195, 46 L.Ed. 264. The ordinance defines 'pawnbroker' to 'mean and include every person whose business or occupation it is to take and receive by way of pledge, pawn or exchange, goods, wares or merchandise, or any kind of personal property whatever, for the repayment or security of any money loaned thereon, or to loan money on deposit or personal property;' and defines 'pawnshop' to 'mean and include every place at which the business of pawnbroker is carried on.' The language of the treaty is comprehensive. The phrase 'to carry on trade' is broad. That it is not to be given a restricted meaning is plain. The clauses, 'to * * * own or lease * * * shops, * * * to lease land * * * for * * * commercial purposes, and generally to do anything incident to or necessary for trade,' and 'shall receive * * * the most constant protection and security of their * * * property, * * *' all go to show the intention of the parties that the citizens or subjects of either

shall have liberty in the territory of the other to engage in all kinds and classes of business that are or reasonably may be embraced within the meaning of the word 'trade' as used in the treaty."

The business of a pawnbroker is a business that has been regulated and restricted under the police powers.

19 R.C.L. § 163, p. 861: "The business of pawnbrokers, because of the facility it furnishes for the commission of crime and for its concealment is one which belongs to a class where the strictest police regulation may be imposed. It is common knowledge that thieves resort to these places to dispose of their stolen goods and that unscrupulous, often criminal persons are engaged in the business."

Clarke v. Deckebach, supra: In this case the court had before it the construction of a treaty existing between the United States and the British Empire, which treaty is designated in said case as a treaty to regulate the commerce between the two countries and provides "and, generally, the merchants and traders of each nation, respectively, shall enjoy the most complete protection and security for their commerce" and holds that in conducting a pool room one does not engage in commerce within the meaning of the treaty which merely extends to merchants and traders.

The court say: "The application of the treaty to the present case requires but brief consideration. As stated in the title its purpose is 'to regulate the commerce' between the two countries. Article I, which it is said affords the protection against the present discrimination, is printed in the margin. It guarantees 'reciprocal liberty of commerce' between the territories of the signatories. The privileges secured by it to the inhabitants of the two countries, so far as relevant to the present controversy, pertain to and are intended to facilitate commerce. The clause suggested as pertinent reads: 'and, generally, the merchants and traders of each nation, respectively, shall enjoy the most complete protection and security of their commerce.' Even if assumed, as argued, that the proprietor of a pool room may

for some purposes be regarded as engaged in a trade, the word being used as synonymous with occupation or employment, he does not engage in commerce within the meaning of a treaty which merely extends to 'merchants and traders' 'protection and security for their commerce.' See Bobe v. Lloyds [2 Cir.] 10 F.2d 730, 734. It would be an extravagant application of the language quoted to say that it could be extended to include the owner of a place of amusement who does not necessarily buy, sell or exchange merchandise or otherwise participate in commerce."

Jordan v. K. Tashiro, 278 U.S. 123, 49 S.Ct. 47, 48, 73 L. Ed. .214: This case holds that the terms "trade" and "commerce" set forth in the treaty under consideration gives Japanese subjects a right to incorporate for the purpose of conducting a hospital and to lease land for that purpose and that treaties must receive a liberal construction.

The court say: .

"The principles which should control the diplomatic relations of nations, and the good faith of treaties as well, require that their obligations should be liberally construed so as to effect the apparent intention of the parties to secure equality and reciprocity between them. See Geofroy v. Riggs, supra; Tucker v. Alexandroff, 183 U.S. 424, 437, 22 S.Ct. 195, 46 L.Ed. 264; Wright v. Henkel, 190 U.S. 40, 57, 23 S.Ct. 781, 47 L.Ed. 948; In re Ross, [Ross v. McIntyre], 140 U.S. 453, 475, 11 S.Ct. 897, 35 L.Ed. 581. Upon like ground, where a treaty fairly admits of two constructions, one restricting the rights that may be claimed under it and the other enlarging them, the more liberal construction is to be preferred. Asakura v. Seattle, 265 U. S. 332, 44 S.Ct. 515, 68 L.Ed. 1041; Tucker v. Alexandroff, supra; Geofroy v. Riggs, supra.

"While in a narrow and restricted sense the terms 'commerce,' or 'commercial,' and 'trade' may be limited to the purchase and sale or exchange of goods and commodities, they may connote, as well, other occupations and other recognized forms of business enterprise which do not neces-

sarily involve trading in merchandise. Asakura v. Seattle, supra. And although commerce includes traffic in this narrower sense, for more than a century it has been judicially recognized that in a broad sense it embraces every phase of commercial and business activity and intercourse. See Gibbons v. Ogden, 9 Wheat. 1, 189, 6 L.Ed. 23."

In Clarke v. Deckebach, supra, the court considered both the rights of the defendant under a treaty and whether or not the law under consideration was discriminatory under the Fourteenth Amendment. In deciding the last question it distinguished between useful business and lawful occupations on the one hand and "a business of dangerous tendencies" on the other and held it within the power of the city to exclude an entire class from conducting a dubious business rather than its objectionable members selected by more empirical methods; but in considering the meaning of terms in the treaty it did not consider this principle. If the court had considered this principle applicable and applied it, it would have been decisive of the question. We, therefore, conclude that the court considered that this principle did not apply and should not be considered in determining the meaning of words or phrases in the treaty.

Article I of the treaty above set forth provides that subjects shall have liberty to reside in the territories of the other, to carry on trade, wholesale and retail, and generally to do anything incident to or necessary for trade upon the same terms as a native citizen, submitting themselves to the laws and regulations there established. The term "trade" as used is not limited in any way. From the rest of the paragraph it is apparent that it is used in a broad and comprehensive sense, not only, but seems to include trade that has been and may be limited and restricted because it provides that subjects must submit to laws and regulations established. At the time this treaty was entered into regulations of useful trade were few, but the sale of beer and wine had been regulated for a long time. The court, therefore, in accordance with the principles and

14

rules of construction set forth in the foregoing cases and the language of the treaty, concludes that the term "trade" in the treaty between the United States of America and Japan includes restricted trade, and that, therefore, a subject of the Empire of Japan occupies the same position and has the same rights in this regard while in this country that a citizen and voter has while said treaty remains in force and effect and that the license to R. Naka was rightfully issued.

An order dismissing the application may be prepared.