# Constitutionality of Proposed Conditions
# to Senate Consent to the Interim Convention
# on Conservation of North Pacific Fur Seals

A proposed condition on the Senate's consent to the Interim Convention on Conservation of North Pacific Fur Seals that dictates how the United States representative to the international North Pacific Fur Seal Commission must vote on certain matters before the Commission is unconstitutional because, rather than setting forth the Senate's understanding of the terms of the convention, it would interfere with the ability of the President and his appointee to execute faithfully the convention according to its terms.

February 6, 1986

MEMORANDUM OPINION FOR THE DEPUTY LEGAL ADVISER,
DEPARTMENT OF STATE

You have asked for our views on the constitutionality of a proposed "condition" to the Senate's consent to the Protocol Amending the Interim Convention on Conservation of North Pacific Fur Seals (Convention). The proposed condition would require the United States representative to the North Pacific Fur Seal Commission (Commission) to vote against any recommendation before the Commission that would result in a commercial taking of fur seals within United States waters, and to abstain from voting on any recommendation that seeks to regulate taking of fur seals for subsistence purposes on the Pribilof Islands. For the reasons set forth below, we believe that this provision would impermissibly interfere with the President's constitutional authority to execute the laws, and therefore would violate the constitutionally mandated separation of powers between the Legislative and Executive Branches.

The Convention, originally signed in 1957, provides an international regime for the protection and management of fur seals. Parties to the Convention (Canada, Japan, the Soviet Union, and the United States) have agreed to coordinate scientific research programs and to cooperate in investigating the fur seal resources of the North Pacific Ocean. Art. II, § 1. The Convention specifically requires that the parties prohibit pelagic sealing (i.e., the killing of fur seals at sea). Art. III. The Convention also provides for establishment of the Commission, which is composed of one member from each party.

The Commission is charged to:

> (a) formulate and coordinate research programs designed to achieve the objectives of the Convention;

12

(b) recommend coordinated research programs to the parties for implementation;

(c) study the data obtained from the implementation of coordinated research programs;

(d) recommend appropriate measures to the parties on the basis of findings obtained from the implementation of coordinated research programs, including measures regarding the size and the sex and age composition of the seasonal commercial kill from a herd; and

(e) recommend to the parties the methods of sealing best suited to achieve the objectives of the Convention.

Art. V, § 2. Decisions and recommendations of the Commission must be unanimous, with each party having one vote. Art. V, § 4.

The Interim Convention was extended by agreement of the parties in 1963, 1969, 1976, and 1980. On October 12, 1984, the parties signed another protocol extending the Convention until October 13, 1988, which the President has submitted to the Senate for its advice and consent.[1] *See* Message from the President of the United States Transmitting the Protocol, signed at Washington on October 12, 1984, Amending the Interim Convention on Conservation of North Pacific Fur Seals between the United States, Canada, Japan, and the Soviet Union, S. Treaty Doc. No. 5, 99th Cong., 1st Sess. (1985).

The staff of the Senate Committee on Foreign Relations, which is now reviewing the Protocol, has proposed that the Senate's consent be subject to four "conditions." The first of these, which you have asked us to review,[2] would provide:

That as a result of the decline of the fur seal population on the Pribilof Islands and other factors, whenever the North Pacific Fur Seal Commission, during the period of this Protocol, considers recommendations to the Parties pursuant to Article V of the Convention, the United States Commissioner shall vote against any recommendation that would result in the taking of fur seals for commercial purposes on lands or waters within the jurisdiction of the United States. The Commissioner shall also abstain from voting on any recommendation that seeks to regu-

---

[1] In addition to extending the Convention, the parties agreed upon a "Statement of Concerns." In that statement, the parties take note of concerns over declines in the fur seal population, current economic conditions, and other problems of fur seal management and conservation.

[2] The other three conditions provide that (1) the North Pacific fur seal herd shall be conserved, managed, and protected pursuant to United States domestic laws to the extent such laws are more restrictive than provided for under the Convention; (2) the Secretary of Commerce is to take appropriate steps under the Convention to develop and implement a program of cooperative research in the Bering Sea ecosystem to determine the causes of the fur seal population decline and to increase the health and viability of the Bering Sea ecosystem and the North Pacific fur seal population; and (3) the subsistence taking of fur seals shall be at no cost to the government. You have not asked us to review these proposed conditions, and we therefore take no position as to their constitutionality.

13

late the taking of fur seals for subsistence purposes on the Pribilof Islands.

Because of the interplay between the Convention and United States domestic law, the effect of this reservation would be to prohibit the commercial taking of fur seals on lands or waters within the jurisdiction of the United States,[3] and to allow subsistence kills of fur seals on the Pribilof Islands only as permitted under United States domestic law.[4]

This proposed condition does not purport to set out the Senate's understanding of the scope of the international obligations imposed by the treaty or its domestic effects;[5] nor does it purport to limit the obligations or rights of the parties under the treaty.[6] Rather, it would limit the discretion of the United States representative, who is appointed by and answerable to the President, to implement the Convention in accordance with its agreed-upon terms. The condition thus reaches beyond the making of the treaty — *i.e.*, delineating the legal obligations and rights of the parties under the agreement — to the actual execution of its terms. Because the execution of a treaty is clearly part of the President's "executive power" under Article II of the Constitution, we believe

[3] The killing of fur seals within United States waters is effectively prohibited by the Marine Mammal Protection Act of 1972, 16 U.S.C. §§ 1361 *et seq* , except as authorized under the Fur Seal Act of 1966, 16 U.S.C. §§ 1151 *et seq.*, which was passed to implement the Fur Seal Convention. Pursuant to § 107 of the Fur Seal Act, 16 U.S.C. § 1157, the Secretary of State, with the concurrence of the Secretary of Commerce, is authorized to accept or reject any recommendation made by the Commission under Article V, and thereby to authorize commercial fur seal kills. Because recommendations of the Commission must be unanimous, the effect of the reservation would be to preclude the Commission from making any recommendation to the Secretary of State for a commercial kill in United States waters.

[4] Indians, Aleuts, and Eskimos who live on the coasts of the North Pacific Ocean are permitted to take fur seals for subsistence purposes under the terms of the Fur Seal Act and the Marine Mammal Protection Act. *See* 16 U.S.C. §§ 1152, 1379.

[5] The Senate has often included "understandings" as part of its consent to ratification. In general, such understandings interpret or clarify the obligations undertaken by a party to the treaty, and do not change those obligations. For example, the Senate Foreign Relations Committee has recently approved the Genocide Convention, subject to several understandings that set forth the Senate's interpretation of certain key definitions in the Convention, and of the relationship between certain other provisions and obligations of the United States under domestic law. *See* S. Ex. Rep. No. 2, 99th Cong., 1st Sess. 16, 21–26 (1985). The Senate has included similar understandings as part of its consent to a number of other treaties. *See generally* Congressional Research Service, *Treaties and Other International Agreements: The Role of the United States Senate*, 98th Cong., 2d Sess. 11, 109–10 (Comm. Print prepared for the Senate Committee on Foreign Relations, 1984) (CRS Study); S. Rep. No. 29, 97th Cong., 1st Sess. 45 (1981) (SALT II Treaty); S. Rep. No. 47, 96th Cong., 1st Sess. 13–25 (1979) (Panama Canal Treaty).

[6] The Senate may, by "reservation" or "amendment," condition its consent to a treaty on a revision or limitation of its terms. *See generally Restatement of the Law, Foreign Relations of the United States (Tentative Draft No. 6) (Restatement)* § 313; CRS Study, *supra*, at 109–10. The resolution of ratification for the Genocide Convention, as reported by the Senate Foreign Relations Committee, would condition the Senate's consent to the Convention on two such reservations: that the specific consent of the United States is required before any dispute to which the United States is a party may be submitted to the jurisdiction of the International Court of Justice, and that nothing in the Convention requires or authorizes legislation or other action by the United States "prohibited by the Constitution of the United States as interpreted by the United States." S. Ex. Rep. No. 2, *supra*, at 17–20. Reservations have also been attached by the Senate (or by the President) to ratification of numerous other treaties, including the Panama Canal Treaty, *see* S Rep. No. 47, *supra*, at 24–25 and the SALT II Treaty, *see* S. Rep. No. 29, *supra*, at 44–45. *See generally* CRS Study, *supra*, at 109–10; L. Henkin, *Foreign Affairs and the Constitution* 134 & n. 23 (1972). Under international law, a substantive revision to the treaty obligations (whether characterized as a "reservation" or an "amendment") must be accepted by the other contracting states. *See Restatement, supra*, § 313.

the proposed condition transgresses the "enduring" and "carefully defined limits" imposed by the Framers on the powers of the coordinate branches. *See INS* v. *Chadha*, 462 U.S. 919, 957–58 (1983).

The powers of the national government were deliberately divided by the Framers among three coordinate branches because they considered the concentration of governmental power to be the greatest threat to individual liberty. "Basic to the constitutional structure established by the Framers was the recognition that '[t]he accumulation of all powers, legislative, executive, and judiciary, in the same hands . . . may justly be pronounced the very definition of tyranny.'" *Northern Pipeline Co.* v. *Marathon Pipe Line Co.*, 458 U.S. 50, 57 (1982) (quoting *The Federalist* No. 47, at 300 (J. Madison) (H. Lodge ed. 1888)). Accordingly, "[t]he Constitution sought to divide the delegated powers of the new Federal Government into three defined categories, Legislative, Executive, and Judicial, to assure, as nearly as possible, that each branch of government would confine itself to its assigned responsibility." *INS* v. *Chadha*, 462 U.S. at 951; *see also Buckley* v. *Valeo*, 424 U.S. 1, 122 (1976). The Supreme Court has long acknowledged that the partitions separating each branch of government from the others must be maintained inviolable if liberty is to be preserved. "The hydraulic pressure inherent within each of the separate Branches to exceed the outer limits of its power, even to accomplish desirable objectives, must be resisted." *INS* v. *Chadha*, 462 U.S. at 951.

The Framers recognized nonetheless that the peculiar nature of treaty-making warranted a limited exception to the strict separation of powers between the branches because the negotiation and acceptance of treaties incorporates both legislative and executive responsibilities:

> [T]he particular nature of the power of making treaties indicates a peculiar propriety in that union. Though several writers on the subject of government place that power in the class of executive authorities, yet this is evidently an arbitrary disposition; for if we attend carefully to its operation it will be found to partake more of the legislative than of the executive character, though it does not seem strictly to fall within the definition of either of them. The essence of the legislative authority is to enact laws, or, in other words, to prescribe rules for the regulation of the society; while the execution of the laws and the employment of the common strength, either for this purpose or for the common defense, seem to comprise all the functions of the executive magistrate. The power of making treaties is, plainly, neither the one nor the other . . . . The qualities elsewhere detailed as indispensable in the management of foreign negotiations point out the executive as the most fit agent in those transactions; while the vast importance of the trust and the operation of treaties as laws plead strongly for the participation of the whole or a portion of the legislative body in the office of making them.

*The Federalist* No. 75, at 450–51 (A. Hamilton) (C. Rossiter ed. 1961); *see also The Federalist* No. 64, at 390–93 (J. Jay); *The Federalist* No. 66, at 402–03 (A. Hamilton); *see generally* CRS Study, *supra*, at 25–28. Rather than vest either the Congress or the President with the sole power to make treaties, the Framers sought to accommodate the interests of both, providing that the President shall make the treaties, but subject to the "advice and consent" of the Senate.[7]

In practice, the Senate's formal participation in the treaty-making process has been to approve, to approve with conditions, or to disapprove treaties negotiated by the Executive.[8] Although the Senate's practice of conditioning its consent to particular treaties is well-established, its authority is not unlimited merely because it may withhold its consent.[9] The general principle that Congress cannot attach unconstitutional conditions to a legislative benefit or program merely because it has authority to withhold the benefit or power entirely applies equally to the Senate's advice and consent authority.[10] For example, the requirement that the Senate consent to appointments of executive officers does not, by inference, empower the Senate to exert control over the removal of officers once approved. *See Myers* v. *United States*, 272 U.S. 52, 126 (1926).[11] The Senate cannot use its advice and consent power to alter the constitutional distribution of powers or to impair constitutionally protected rights, any more than the President and the Senate together can override the requirements of the Constitution:

> [N]o agreement with a foreign nation can confer power on the Congress, or on any other branch of Government, which is free from the restraints of the Constitution.
>
> *       *       *
>
> The prohibitions of the Constitution were designed to apply to all branches of the National Government and they cannot be

---

[7] Article II, § 2, cl. 2 of the Constitution provides in part that the President "shall have Power, by and with the Advice and Consent of the Senate, to make Treaties, provided two thirds of the Senators present concur."

[8] President Washington attempted to consult with the Senate, with limited success, on the negotiation of several treaties with the Indians. By 1816 the practice had become so firmly established that the Senate would grant its "advice and consent" to treaties already negotiated by the President or his representatives. *See* CRS Study, *supra*, at 34–36; L. Henkin, *Foreign Affairs and the Constitution*, *supra*, at 131–32.

[9] The Senate adopted a resolution advising and consenting to the Treaty of 1797 with Tunis on condition that a certain article be suspended and renegotiated. The Senate later gave its advice and consent to the treaty and two other articles after they had been renegotiated. CRS Study, *supra*, at 36. The Supreme Court has recognized the validity of the practice, but has never delineated the outer limits of the Senate's power to condition its consent. *See Fourteen Diamond Rings* v. *United States*, 183 U.S. 176, 182 (1901) (Brown, J., concurring); *Haver* v. *Yaker*, 76 U.S. (9 Wall.) 32, 35 (1869).

[10] For example, Congress could, if it chose, bar aliens from our shores, but could not admit them under conditions which deprive them of constitutional rights such as the right to a fair trial. *Wong Wing* v. *United States*, 163 U.S. 228, 237 (1896).

[11] Similarly, the Senate may not use its advice and consent power with respect to treaties to impose conditions affecting only the domestic aspects of a treaty. *See Power Authority* v. *Federal Power Comm'n*, 247 F.2d 538 (D.C. Cir.), *vacated as moot*, 355 U.S. 64 (1957). The Senate could not, for example, condition its consent to the Convention on a provision depriving the Secretaries of State and Commerce of their authority under the Fur Seal Act to adopt recommendations of the Commission. Such a condition would in effect amend the existing statutory discretion of those Executive Branch officers, and could be accomplished only through plenary legislation. *See INS* v. *Chadha*, 462 U.S. at 952–54.

> nullified by the Executive or by the Executive and the Senate combined.

*Reid* v. *Covert*, 354 U.S. 1, 16–17 (1957). *See also Geofroy* v. *Riggs*, 133 U.S. 258, 267 (1890); *The Cherokee Tobacco*, 78 U.S. (11 Wall.) 616, 620–21 (1871); *Fourteen Diamond Rings* v. *United States*, 183 U.S. at 183 (1901) (Brown, J. concurring).

Thus, it is critical that the "JOINT AGENCY of the Chief Magistrate of the Union, and of two-thirds of the members of the Senate"[12] embodied in Article II, § 2, cl. 2, extends only to the *making* of treaties, *i.e.*, the negotiation and agreement with other nations as to the legal obligations and rights of the parties. Nothing in the text of the Constitution or the deliberations of the Framers suggests that the Senate's advice and consent role in the treaty-making process was intended to alter the fundamental constitutional balance between legislative authority and executive authority. In fact, the Framers included the Senate in the treaty-making process precisely because the result of that process, just as the result of the legislative process, is essentially a law that has "the effect of altering the legal rights, duties and relations of persons . . . outside the Legislative Branch." *INS* v. *Chadha*, 462 U.S. at 952.

Under the Constitution, only the President is given the "executive power," and is charged with the specific responsibility to "take Care that the Laws be faithfully executed." U.S. Const. art. II, §§ 1 and 3. It is indisputable that treaties are among the laws to be executed by the President,[13] and that "the very delicate, plenary and exclusive power of the President as the sole organ of the federal government in the field of international relations," which necessarily includes fulfilling obligations under international agreements or treaties, is part of the executive power. *See United States* v. *Curtiss-Wright Export Corp.*, 299 U.S. 304, 320 (1936); *see also Haig* v. *Agee*, 453 U.S. 280, 291–92 (1981); *Chicago & Southern Air Lines* v. *Waterman S.S. Corp.*, 333 U.S. 103, 190 (1948).

The condition proposed by the staff of the Senate Foreign Relations Committee would strike at the heart of the President's executive prerogatives. Absent such a condition, the United States representative to the Fur Seal Commission would be free to follow the directions of the President in evaluating the complex questions that come within the jurisdiction of the Commission. The proposed condition, however, would eliminate that discretion with respect to two issues likely to come before the Commission. Such a limitation on the discretion of the President's representative — a limitation that takes effect only after the scope of the legal obligations of all parties has been agreed upon[14] —

---

[12] *The Federalist* No. 66, at 406 (A. Hamilton) (C. Rossiter ed. 1961).

[13] Article VI, cl. 2 of the Constitution provides in part that "all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land." The President's constitutional duty under Article II extends to treaties as well as to statutes and the Constitution itself. *See In re Neagle*, 135 U.S. 1, 64 (1890); 1 Op. Att'y Gen. 566, 570 (1822).

[14] The condition is thus different from a reservation that would seek to limit the legal authority of the Commission to consider recommendations for commercial fur seal kills within United States waters, or for

Continued

17

would directly undercut the President's authority "as the sole organ of the federal government in the field of international relations." The Senate cannot constitutionally impose such a condition to its consent to ratification of a treaty, any more than it could consent to the appointment of an ambassador on the condition that the ambassador refrain from taking certain positions in negotiations or discussions with his designated country. *See generally Myers* v. *United States*, 272 U.S. at 126; 3 Op. Att'y Gen. 188, 189–90 (1837).

CHARLES J. COOPER
*Assistant Attorney General*
*Office of Legal Counsel*

---

[14] (. . . continued)

subsistence harvests on the Pribilof Islands. Such a reservation would be consistent with the constitutional separation of powers, as it would be a legitimate exercise of the treaty-making power to define the legal obligations and rights of the parties, prior to conclusion of the treaty. Of course, any such reservation would have to be submitted to the other parties for their agreement prior to taking effect. *See supra* note 6.