**Slip Op. 05-51**

**United States Court of International Trade**

```
┌─────────────────────────────────────┐
│ THE PILLSBURY COMPANY,               │
│                                      │
│              Plaintiff,              │
│                                      │
│     v.                               │
│                                      │
│ UNITED STATES,                       │
│                                      │
│              Defendant.              │
│                                      │
│                                      │
└─────────────────────────────────────┘
```

Before: Pogue, Judge

Court No. 03-00096

[Plaintiff's Motion for Summary Judgment granted; Defendant's Cross-Motion for Summary Judgment denied.]

April 19, 2005

Neville Peterson LLP (John M. Peterson, Maria E. Celis, Margaret R. Polito, and George W. Thompson) for The Pillsbury Company.

Peter D. Keisler, Assistant Attorney General, Barbara S. Williams, Attorney in Charge, International Trade Field Office, Commercial Litigation Branch, Civil Division, U.S. Department of Justice Chi S. Choy, Of Counsel, Office of Assistant Chief Counsel, U.S. Customs and Border Protection, for Defendant.

**Pogue, Judge**: Plaintiff, The Pillsbury Company ("Pillsbury"), challenges a decision by the United States Bureau of Customs and Border Protection ("Customs" or "Defendant") classifying certain imports of ice cream. Customs classified Plaintiff's imports under subheading 2105.00.20 of the Harmonized Tariff Schedule of the United States (1999) ("HTSUS") dutiable at a rate of 51.7 cents per kilogram plus 17.5% ad valorem. Pillsbury asserts that Customs

should have classified these imports under subheading 2105.00.10, HTSUS, and assessed a 20% ad valorem duty.

Before the Court are cross-motions for summary judgment. As the parties have agreed to all the essential facts, the issue presented is a pure question of law, rendering this case ripe for summary judgment. Brother Int'l Corp. v. United States, 26 CIT 867, 869, 248 F. Supp. 2d 1224, 1226 (2002); USCIT R. 56©). The Court has exclusive jurisdiction over this question pursuant to 19 U.S.C. § 1514 (2000) and 28 U.S.C. § 1581(a). For the reasons set forth below, the Court finds that Customs should have classified the imports in question under subheading 2105.00.10, HTSUS, and therefore grants summary judgment for the Plaintiff.

## I. BACKGROUND

### A.

As part of the Uruguay Round of the General Agreement on Tariffs and Trade ("GATT"), the member states of the World Trade Organization ("WTO")[1] agreed to abolish quantitative limitations on imports of agricultural products. WTO Agreement on Agriculture, art. 4(2)[2]; see also 7 U.S.C. § 624(f), 7 C.F.R. § 6.20 (2005).

_____

[1]The World Trade Organization (WTO) was created as part of the Uruguay Round and replaced the General Agreement of Tariffs and Trade ("GATT").

[2]The Agreement can be found at: http://www.wto.org/english/docs_e/legal_e/14-ag.pdf (last accessed April 11, 2005).

Nevertheless, the Uruguay Round did permit member states to adopt tariff rates that are contingent on the volume of imports of a certain product, often referred to as tariff rate quotas ("TRQs"). Under the TRQ regime, the tariff rate is adjusted depending on the volume of imports of a given product into the United States during a certain year. TRQs are a departure from the absolute quota restrictions under the GATT because nations are not allowed to set specific limits on imports – rather, member states are only allowed to increase tariff rates for imports after certain levels of imports have been reached. To take a simplified version of the facts in this case as an example of a TRQ, the United States may agree to allow 5,191,031 liters of ice cream into the United States, at a tariff rate of 20% <u>ad valorem</u>, and then, after that quota level has been reached, assess a tariff rate of 51.7 cents per kilogram plus 17.5% <u>ad valorem</u> for all subsequent entries.[3]

---

[3]This is one example of a TRQ. The United States' TRQs can be classified into three general categories: (1) minimum access provisions, (2) maximum access provisions, and (3) licensing provisions. <u>See</u> Def.'s Mem. Supp. Cross-Mot. Sum. J. & Opp'n Pl.'s Mot. Sum. J. ("Def.'s Mem.") at 7. Minimum access provisions establish that an aggregate quantity of a classified product "shall not exceed" a certain quantity. <u>See e.g.</u>, Chapter 20, Additional Note 4, HTSUS; Chapter 18, Additional U.S. Note 2, HTSUS. Maximum Access provisions provide that the aggregate quantity of a product "shall not exceed" the quantities specified for each state or group of states. <u>See</u> Chapter 24, Additional U.S. Note 5, HTSUS. Licensing provisions require import licenses for specified products. See Chapter 4, Additional Note U.S. 19, HTSUS; <u>see also</u> David W. Skully, Economics of Tariff-Rate Quota Administration, Technical Bulletin No. 1893, available at <u>http://www.ers.usda.gov/publications/</u>tb1893/tb1893.pdf (April 2001) (last accessed April 11, 2005) (setting out categories of

The United States, a member state of the WTO, has adopted many TRQs.

Before the Uruguay Round began, Congress expressed the negotiating objectives of the United States: to develop "(1) more open, equitable, and reciprocal market access; (2) the reduction or elimination of barriers and other trade-distorting policies and practices; and (3) a more effective system of international trading disciplines and procedures."  19 U.S.C. § 2901(a).  To this end, Congress granted the President the authority to "enter into trade agreements with foreign countries; and [subject to certain limitations proclaim[4]] -- (I) such modification or continuance of any existing duty, (ii) such continuance of existing duty-free or excise treatment, or (iii) such additional duties; as he determines to be required or appropriate to carry out any such <u>trade agreement</u>."  19 U.S.C. § 2902 (emphasis added).

Specifically, with regard to the provisions at issue in this case, during the Uruguay Round negotiations, the United States agreed to certain commitments with regard to the importation of ice cream.  This agreement is recorded as "Schedule XX" (a schedule listing the United States' tariff concessions for numerous

---

administration methods of TRQs in the WTO as "applied tariffs," "first-come, first-served," "licenses on demand," "auctioning," "historical," "state trader producer group," "mixed" and "other or not specified.").

[4]The term "proclaim" means to amend the tariff laws of the United States.  <u>See</u> 19 U.S.C. § 3004©).

products).  See Schedule XX -- United States of America, annexed to the Marrakesh Protocol to the General Agreement on Tariffs and Trade 1994 ("Schedule XX").  Pursuant to his authority granted by Congress, i.e., 19 U.S.C. § 2902, President Clinton proclaimed portions of Schedule XX into United States law.  See Presidential Proclamation 6763 of Dec. 23, 1994, 60 Fed. Reg. 1007, 1131 & 1137 (Jan. 4, 1995).  Nearly simultaneously, Congress expressed its support for the United States' commitments under Schedule XX by providing the President specific authority to: (i) proclaim Schedule XX into U.S. law;[5] (ii) proclaim future agreements to

---

[5]19 U.S.C. § 3521(a)(1)-(3).  Title 19 Section 3521 provides:

(a) In general
In addition to the authority provided by [19 U.S.C. § 2902], the President shall have the authority to proclaim--
> (1) such other modification of any duty,
> (2) such other staged rate reduction, or
> (3) such additional duties,
> as the President determines to be necessary or appropriate to carry out Schedule XX.


(b) Other tariff modifications
Subject to the consultation and layover requirements of [19 U.S.C. § 3524], the President may proclaim-
> (1) the modification of any duty or staged rate reduction of any duty set forth in Schedule XX if--
> > (A) the United States agrees to such modification or staged rate reduction in a multilateral negotiation under the auspices of the WTO, and
> > (B) such modification or staged rate reduction applies to the rate of duty on an article contained in a tariff category

reduce duties under the "auspices of the WTO";[6] and (iii) to correct "technical errors in Schedule XX or to make other rectifications to the Schedule."[7]  See H.R. Rep. No. 103-826, pt. 1, at 28-29 (1994); S. Rep. No. 103-412, at 18 (1994).[8]  As part of these concerted actions of Congress and the President, the United States adopted a TRQ for ice cream codifying Schedule XX as Note 5 to Chapter 21, HTSUS ("Note 5").[9]

Note 5 provides:

_____

> that was the subject of reciprocal duty elimination or harmonization negotiations during the Uruguay Round of multilateral trade negotiations, and
>
> (2) such modifications as are necessary to correct technical errors in Schedule XX or to make other rectifications to the Schedule.

[6]19 U.S.C. § 3521(b)(1)(A).

[7]19 U.S.C. § 3521(b)(2); see also Presidential Proclamation 7011 of June 30, 1997, 62 Fed. Reg. 35,909 at para. 3 (July 2, 1997).  Although 19 U.S.C. § 3521 was passed after the President proclaimed Note 5, 19 U.S.C. § 3521 would have required the President to amend Note 5 to conform with Schedule XX if Note 5 had not already conformed to Schedule XX.

[8]Nevertheless, although Note 5 became part of United States law, the exact language of Note 5 was never voted on by the House and the Senate nor presented to the President for his signature. Cf. U.S. Const. art 1 sec. 7.

[9]Although Customs initially maintained that Schedule XX and Note 5 conflicted, Customs now maintains that "there is no substantive conflict" between Note 5 and Schedule XX. Def.'s Supp. Mem. Resp. Chambers' Letter Dated Jan. 25, 2005, ("Def.'s Supp. Mem.") at 3.

The aggregate quantity of ice cream entered under subheading 2105.00.10 in any calendar year shall not exceed 5,191,031 liters (articles the product of Mexico shall not be permitted or included in the aforementioned quantitative limitation and no such articles shall be classifiable therein).

Of the quantitative limitations provided for in this note, the countries listed below shall have access to not less than the quantities specified below:

|              | Quantity (liters) |
| --- | --- |
| Belgium      | 922,315           |
| Denmark      | 13,059            |
| Jamaica      | 3,596             |
| Netherlands  | 104,477           |
| New Zealand  | 589,312           |

If ice cream imports fall within these limits (i.e., "in-quota"), Customs classifies the entries under subheading 2105.00.10 and assesses a 20% ad valorem duty rate. Subheading 2105.00.10, HTSUS. Alternatively, if the quota level is exhausted (i.e., "over-quota"), Customs classifies the entries under subheading 2105.00.20, HTSUS, and assesses a duty of 51.7 cents per kilogram plus 17.5% ad valorem. Subheading 2105.00.20, HTSUS. As is apparent in the language quoted above, Note 5 further provides that enumerated nations, i.e., those specifically mentioned, shall have access to a specified volume of imports regardless of how many liters of ice cream are imported from other nations. Additionally, because the amounts specifically allocated to the enumerated nations total 1,632,759 liters, far less than aggregate level

allowable of 5,191,031 liters, the language implies that there exists a "common pool" which may be used by all WTO nations -- including the enumerated nations if they have exceeded their minimum access quotas.  For imports implicating the "common pool," Customs allocates the quota on a first-come-first-served basis. See 19 C.F.R. § 130 et seq.

What is unclear from Note 5's language, and what is at issue here, is whether ice cream imported from nations, other than those specifically listed, may qualify under the unused portions of the enumerated nations' allotments at the expiration of the year.  To wit, whereas Note 5 is clear that the enumerated nations' imports may invade the "common pool" if the "common pool" has not been exhausted, the parties in this case disagree as to whether all other nations may invade the enumerated nations' unused allotments.

**B.**

Plaintiff is an importer of ice cream products.  On March 27, 1999, an ice cream factory exploded in Le Mars, Iowa.  That factory had been producing Haagen-Dazs ice cream for Pillsbury. Pl.'s Mem. Points and Authorities R. 56 Supp. Mot. Summ. J. at 2 ("Pl.'s Mem.").  As a result of the explosion, Pillsbury did not have sufficient production in the United States to meet demand. Consequently, in the spring of 1999, Pillsbury imported ice cream

from its Haagen-Dazs factory in France in order to meet its production needs.  Id.

At first, Customs classified Pillsbury's entries under subheading 2105.00.10, HTSUS.  However, commencing in July, 1999, 3,558,272 liters of the "common pool" had been imported and Customs then assessed Pillsbury's imports at the over-quota rate.  When the quota year ended on December 31, 1999, the enumerated nations had not used their allotments.  In fact, Belgium, Denmark, Jamaica, and New Zealand had shipped no ice cream to the United States during 1999, and the Netherlands had shipped only 82 liters of ice cream. See Pl.'s R. 56 Statement Material Facts Not in Dispute at paras. 13, 14; Def.'s Pl.s Stat. Mat. Facts at paras. 13, 14. Consequently, Customs permitted only 3,558,354 liters of ice cream to enter under the lower tariff rate.  Given this short-fall, Pillsbury made a timely request to have certain of its over-quota imports reliquidated at the lower tariff rate.  Customs did not respond to Pillsbury's request and, after 30 days, the protest was deemed denied.  See 19 C.F.R. § 174.22(d).  Pillsbury timely sought judicial review of Customs' denied protest.

## II. STANDARD OF REVIEW

Although the parties disagree over the proper standard of review, this question is squarely addressed by the Supreme Court's decisions in United States v. Haggar Apparel Co., 526 U.S. 380

(1999) and United States v. Mead, 533 U.S. 218 (2001).  In Haggar Apparel Co., 526 U.S. at 386-89, the Supreme Court held that when Commerce adopts regulations pursuant to notice and comment rule making, the Court should accord those regulations deference pursuant to the Supreme Court's decision in Chevron U.S.A., Inc. v. National Resources Defense Council, Inc., 467 U.S. 837, 842-43 (1984) ("Chevron deference").  However, when Customs has not issued a regulation adopted by notice and comment rule making, its interpretation of an ambiguous statute is entitled to deference only commensurate with its power to persuade ("Skidmore deference").  See Mead, 533 U.S. 218, 235 (2001) (citing Skidmore v. Swift & Co., 323 U.S. 134, 140 (1944)).

Customs argues three theories as bases for its claim of entitlement to Chevron deference: (1) one of its regulations, 19 C.F.R. § 133.2(c), is at issue, (2) the absence of any regulations supporting Pillbury's position, and (3) the United States Trade Representative's ("USTR") role in proclaiming modifications to the HTSUS.  The Court disagrees that any of these theories implicate Chevron deference.

First, 19 C.F.R. § 132.2(c) states that the "terms of a Presidential proclamation, Executive order, or legislative enactment establishing a quota, and the regulations implementing the quota, must be strictly complied with."  According to Customs, this regulation requires that unless the statute clearly permits

the reallocation of unused quotas, then reallocation is forbidden under its regulations.[10]  Alternatively, Customs argues that this regulation supports its interpretation of Note 5, and that specifically its determination as to whether Note 5 is ambiguous or unambiguous is entitled to deference.  Customs' analysis, however, does not follow established administrative law.

The HTSUS is, of course, a statute.  An agency's interpretation of a statute is entitled to deference only after the Court, reviewing the statute de novo (commonly referred to as Chevron Step I), finds that there is a statutory ambiguity or gap. Gen. Dynamic Land Sys. v. Cline, 540 U.S. 581, 600 (2004) ("Even for an agency able to claim all the authority possible under Chevron, deference to its statutory interpretation is called for only when the devices of judicial construction have been tried and

---

[10]This argument entirely begs the question. Customs must strictly comply with Note 5, but with what meaning applied to Note 5?  Certainly regulations are the creatures of an agency's own creation, and agency interpretations of their regulations may be entitled to deference.  Auer v. Robbins, 519 U.S. 452, 461-62 (1997), Cathedral Candle Co. v. United States ITC, slip op. 04-1083 (Fed. Cir. March 9, 2005); but cf. Keys v. Barnhart, 347 F.3d 990, 993 (7th Cir. 2003) (Posner, J.) ("Probably there is little left of Auer.").  But this is true only so long as the "interpretation" is not wholly erroneous.  Auer, 519 U.S. at 461.  Here, the cited regulation in no way leads to the interpretation Customs places on it – it does not mention reallocation or in any way suggest the resolution of this matter.  Deferring to Customs' interpretation here would be tantamount to giving deference solely to an agency's litigation position.  Moreover, the Court's conclusion is bolstered by the fact that it does not appear that Customs is even entitled to promulgate regulations entitled to deference in this matter. See infra at note 19.

found to yield no clear sense of congressional intent."), Barnhart v. Sigmon Coal Co., 534 U.S. 438, 462 (2002) ("In the context of an unambiguous statute, we need not contemplate deferring to the agency's interpretation."); see also EEOC v. Arabian Am. Oil Co., 499 U.S. 244, 260 (Scalia, J. concurring) (rejecting the majority's characterization that the EEOC's decision be viewed under Skidmore rather than Chevron deference, but noting that the presumption against extraterritoriality trumps Chevron deference).[11]   In conducting this initial de novo review, the Court will look to the plain language of the statute, grammatical, and substantive canons of statutory interpretation, Barnhart, 534 U.S. at 452, DeBartolo Corp. v. Florida Gulf Coast Bldg. & Constr. Trades Council, 485 U.S. 568, 575 (1988), the statute's legislative history, Rust v. Sullivan, 500 U.S. 173, 186 (1991), and all other relevant tools of statutory construction, FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120 (2000), to determine whether Congress has spoken on the question.  Whether an agency, by regulation or otherwise, deems a statute to be ambiguous or unambiguous, or should be strictly construed, is immaterial to this inquiry and Customs is not entitled to deference on this question.

---

[11]An agency's authority to give meaning to a statute is also only proper where Congress has so delegated that authority to an agency by leaving a statutory gap or ambiguity.  The Court must first assure itself that Congress has delegated that task to an agency before any deference to that agency is warranted. Accordingly, this review is conducted de novo.  See Chevron, 467 U.S. at 843-44.

Second, Customs contends that the absence of regulations supporting Plaintiff's position substantiates its position, i.e., this absence demonstrates that Customs has not adopted Pillsbury's interpretation.[12]   Customs further argues that this "absence" of regulations is entitled to Chevron deference.

Again, Customs' analysis is does not follow established jurisprudence. Non-existent regulations are not "promulgated" through notice and comment rule making, Haggar Apparel Co., 526 U.S. at 388, nor are there "any other circumstances reasonably suggesting that Congress ever thought [of Customs] as deserving the deference claimed for them here." Mead, 533 U.S. 218, 231.   Nor do non-existent regulations offer any explanations of the law or reasoning for their legal conclusions, and consequently, non-existent regulations could not have the "power to persuade," Id. at 233.[13]  Accordingly, this "absence" of regulations is entitled to no deference.

Customs' third argument has also been rejected by the United States Supreme Court.   Despite the fact that USTR and the

---

[12]Customs contends that if Pillsbury were correct, Customs would have a procedure for reallocation.  The Court finds this argument curious in the light of 19 C.F.R. § 132.13(a)(1)(i) (establishing a procedure for refunding money paid at the over-quota rate) which could be employed in this case.

[13]Of course, had Customs promulgated regulations, which occupied the interpretative field of this provision, the Court's analysis would be different.  But when Customs has issued no regulations directing the enforcement of this provision, Chevron deference cannot be warranted.

International Trade Commission ("ITC") have extensive authority to proclaim changes directly to the tariff schedule, Congress did not entrust them with the authority for administering the adopted tariff schedules. Haggar Apparel Co., 526 U.S. at 388-89. Accordingly, it is for the "Customs Service, not for USTR or ITC, to issue regulations entitled to judicial deference in the interpretation of the tariff schedules." Id. Customs may not ride the coat-tails of USTR and ITC in claiming deference because of other agencies' authority.

Accordingly, Customs is not entitled to Chevron deference here. Nor is Customs entitled to Skidmore deference. Customs did not issue a Headquarters Letter Ruling and has provided no justification, outside of its briefs, for its actions. Moreover, Customs' only related Letter Ruling contradicts its decision in this case. Headquarter Ruling Letter 962316 (Nov. 5 1998) (recognizing that "minimum access" guarantees do not establish limits on importation). Therefore, no deference will be granted, and the Court will consider the question presented de novo.


### III. DISCUSSION

The question presented is whether Customs must reallocate the enumerated nations' unused allotments. Consequently, at issue is the proper meaning of Note 5 to Chapter 21:

The aggregate quantity of ice cream entered under subheading 2105.00.10 in any calendar year shall not exceed 5,191,031 liters (articles the product of Mexico shall not be permitted or included in the aforementioned quantitative limitation and no such articles shall be classifiable therein).

Of the quantitative limitations provided for in this note, the countries listed below shall have access to not less than the quantities specified below:

|              | Quantity (liters) |
|--------------|-------------------|
| Belgium:     | 922,315           |
| Denmark:     | 13,059            |
| Jamaica:     | 3,596             |
| Netherlands: | 104,477           |
| New Zealand: | 589,312           |

The issue that gives rise to this dispute centers around the word "access." More specifically, the question centers on what type of "access" is implicated. Customs essentially argues that there is an implied term "exclusive" before the word "access," i.e., that "the countries listed below shall have [exclusive] access to the quantities listed below." Pillsbury disagrees essentially asserting that the implied term is "the right of first" access, i.e., that "the countries listed below shall have [the right of first] access to the quantities listed below." As discussed above, Note 5 implements the United States' international commitments under Schedule XX. See discussion on the history of this provision supra at 4-6. Read in light of Schedule XX, the meaning of Note 5 is unambiguous. Consequently, the Court answers this question by reference to Schedule XX.

**A.**

In this case, two interrelated bedrock principles of statutory construction strongly counsel in favor of using Schedule XX as an aid in construing Note 5: the canon of constitutional avoidance and the Charming Betsy canon.

As Customs has conceded, the relevant statutory authorizations permitted the President to proclaim modifications to the HTSUS to bring the HTSUS in accord with the United States' international legal obligations stated under Schedule XX.  See 19 U.S.C. §§ 2902 & 3521.  If Note 5 differs from Schedule XX without good cause, the President's actions would have been ultra vires, i.e., exceeded his authority, and therefore his actions would have been unlawful as not in accordance with Congressional intent.

This proposition is, in part,[14] driven by the fact that the provisions of the HTSUS are "statutory provisions of law."  19 U.S.C. § 3004(c).  Accordingly, any amendments thereto must conform

_____

[14]The Court notes that even if the HTSUS were a regulation, the President could still only proclaim that which he was instructed to proclaim by Congress.  The only difference is the degree of discretion afforded to the President.  If the HTSUS were only a regulation, Congress need only enunciate an intelligible principle, J.W. Hampton Jr., & Co. v. United States, 276 U.S. 394, 406-410 (1928); however, given that the HTSUS is statutory law, constitutionally, the President may be accorded only limited discretion.  Accordingly, any attempt to read broad discretion into Congress' authorization would be improper.  See sources cited infra at note 15.  This is especially true here where Customs may have discretion, through the promulgation of regulations, in the execution of the law proclaimed by the President, see Haggar Apparel Co., 526 U.S. at 388, creating the possibility of two layers of deference.

with the strictures of Article I Section 7 of the Constitution so long as the amendments can be considered "law-making".[15]  As the Supreme Court found in Field v. Clark, certain changes to a statutory scheme are not considered "law-making" when Congress delegates the President the authority to make changes to the law such that: (1) those changes are necessary to accommodate to future contingent (international) developments, and (2) where Congress has specifically instructed the President on how, (3) and when, the law is to be amended, leaving little to the President's discretion. Field v. Clark, 143 U.S. at 693-94; see also Clinton v. City of New York, 524 U.S. 417, 442-45 (1998); but cf. Terran v. Secretary of HHS, 195 F.3d 1302, 1313 (Fed. Cir. 1999) (suggesting in dicta that this may extend to domestic issues as well).  This principle was reaffirmed in the Supreme Court's decision in Clinton v. City of New York, 524 U.S. 417 (1998) (invalidating an unconstitutional delegation of lawmaking authority).

---

[15]See, e.g.,  Clinton v. City of New York, 524 U.S. 417, 442 (1998) (invalidating an unlawful delegation of lawmaking power), Field v. Clark, 143 U.S. 649, 693 (1898), Star-Kist Foods, Inc. v. United States, 47 CCPA 52, 60, 275 F.2d 472, 380 (1959); see also INS v. Chadha, 462 U.S. 919, 951 (1983); Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 587 (1952); US Const. art. I sec. 7 ("Every Bill which shall have passed the House of Representatives and the Senate, shall, before it becomes a Law, be presented to the President.").
    The Court further notes that even at the apex of the President's inherent authority, the Court would only give effect to an executive agreement by the terms stated in the agreement. See Am. Ins. Ass'n v. Garamendi, 539 U.S. 396, 417 (2003) (refusing to preempt state law on the basis of an executive agreement because the agreement did not contain a preemption clause).

The Court need not dwell on this issue because Schedule XX, interpreted in light of the plain language of Note 5, contains no ambiguity regarding the issue presented here.  See infra at § III.c.  Therefore, as counseled by the canon of constitutional avoidance, the Court will give effect to that reading of Note 5 which is implicated by Schedule XX.  Clark v. Martinez, 125 S. Ct. 716, 724 (2005) ("It is a tool for choosing between competing plausible interpretations of a statutory text, resting on the reasonable presumption that Congress did not intend the alternative which raises serious constitutional doubts."), DeBartolo Corp. v. Florida Gulf Coast Bldg. & Constr. Trades Council, 485 U.S. 568, 575 (1988); Industrial Union Dep't, AFL-CIO v. Am. Petroleum Inst., 448 U.S. 607, 646 (1980) (overturning the Secretary of Labor's interpretation of a statute because a "construction of the statute that avoids this kind of open-ended grant should certainly be favored.") (opinion of Justice Stevens).

This proposition is reinforced by the Charming Betsy canon of statutory construction.  "For two centuries [courts] have affirmed that the domestic law of the United States recognizes the law of nations."  Sosa v. Alvarez-Machain, 124 S. Ct. 2739, 2765 (2004). One important way the courts have recognized this principle is through the invocation of the Charming Betsy canon of statutory construction.  Appropriately named after the Supreme Court's decision in Murray v. The Schooner Charming Betsy,  6 U.S. (2

Cranch) 64 (1804)), the Charming Betsy canon holds that "an act of congress ought never be construed to violate the law of nations, if any other possible construction remains." Charming Betsy, 6 U.S. (2 Cranch) at 118. In this case, the United States has accepted obligations to permit specified levels of ice cream into the United States at certain duty levels under Schedule XX. To suggest that there is a conflict between Schedule XX and Note 5 would offend the well settled principle that the abrogation of international agreements by implication is strongly disfavored. See e.g., Weinberger v. Rossi, 456 U.S. 25, 35 (1982) ("affirmative congressional expression [is] necessary to evidence an intent to abrogate provisions in 13 international agreements"), United States v. Lee Yen Tai, 185 U.S. 213, 221 (1902) ("the purpose by statute to abrogate a treaty or any designated part of a treaty . . . must not be lightly assumed, but must appear clearly and distinctly from the words used in the statute"), Roeder v. Islamic Republic of Iran, 333 F.3d 228, 237-38 (D.C. Cir. 2003) (neither a treaty nor executive agreement will be deemed abrogated unless Congress clearly expresses its intent). Pursuant to this principle, unless Note 5 explicitly conflicts with the United States' international obligations, see e.g., McCulloch v. Sociedad Nacional de Marineros de Honduras, 372 U.S. 10, 21 (1963), The Chinese Exclusion Case, 130 U.S. 581, 600 (1889), the Court should endeavor to read Note 5 in harmony with Schedule XX. This conclusion is rendered

unavoidable by the fact that Congress specifically expressed its intent that the United States comply with its international legal obligation, rather than clearly expressing an intent to abrogate the United States' international commitment. <u>See</u> 19 U.S.C. §§ 2902 & 3521; <u>see also</u> 19 U.S.C. § 2901 (expressing the aspiration for reciprocal and fair trade); <u>cf.</u> <u>Intel Corp. v. Advanced Micro Devices, Inc.</u>, 124 S. Ct. 2466, 2479 (2004) (employing Congressional instructions as an interpretative aid).

**B.**

Schedule XX provides in relevant part:

There shall be permitted entry an aggregate quantity of ice cream, entered under subheading 2105.00.10 during any calendar year, of not less than the total quantity specified below.

|      | Quantity (liters) |
| --- | --- |
| 1995 | 3,283,772* |
| 1996 | 3,760,587* |
| 1997 | 4,237,402* |
| 1998 | 4,714,216* |
| 1999 | 5,191,031* |
| 2000 | 5,667,846* |
| and thereafter | |

\* Of the quantitative limitation provided for in this note, an access level is reserved as follows:

|      | Quantity (liters) |
| --- | --- |
| Belgium | 922,315 |
| New Zealand | 589,312 |
| Denmark | 13,059 |
| Netherlands | 104,477 |
| Jamaica | 3,596 |

> An additional aggregate quanity of 366,000 liters
> is reserved for Mexico under this note and
> additional note 3 to chapter 4 combined.
>
> The quantitative limitation established by this note
> may be administered through regulations (including
> licenses and reallocation of the unfilled quotas)
> issued by the Secretary of Agriculture.

The Court construes international agreements in a manner similar to its interpretation of statutes.  "The analysis must begin . . . with the text of the treaty and the context in which the written words are used."  Air France v. Saks, 470 U.S. 392, 396-97 (1985). Because "treaties are the subject of careful consideration before they are entered into, and are drawn by persons competent to express their meaning and to choose apt words," Rocca v. Thompson, 223 U.S. 317, 332 (1912), the courts must "give the specific words of the treaty a meaning consistent with the shared expectations of the contracting parties," Air France, 470 U.S. at 399.  The plain language of Schedule XX demonstrates why Customs' argument must fail.

Schedule XX explicitly provides that "[t]here shall be permitted entry an aggregate quantity of ice cream, entered under subheading 2105.00.10 during [1999], of not less than . . . 5,191,031 [liters]."  The unavoidable conclusion that this language requires reallocation is demonstrated by the facts of this case. In 1999, the United States imported no ice cream from Belgium, Denmark, Jamaica, and New Zealand and only imported 82 liters from

the Netherlands.  Accordingly, (and as Customs administered the matter in this instance) only 3,448,354 liters entered under subheading 2105.00.10, HTSUS.  Therefore, Customs did not "permit[] entry an aggregate quantity of ice cream . . . of not less than . . . 5,191,031" liters; rather, Customs permitted entry of an aggregate quantity far less than required by Schedule XX to be entered under subheading 2105.00.10, HTSUS.  This plain reading of Schedule XX clearly dictates why Customs' interpretation is untenable.[16]  See, e.g., Soc'y for Propagation of the Gospel in Foreign Parts v. Town of New Haven, 21 U.S. (8 Wheat.) 464, 490 (1823) ("Where the language of the parties is clear of all ambiguity, there is no room for construction."); cf. Koons Buick Pontiac GMC, Inc. v. Nigh, 125 S. Ct. 460, 469 (2005) ("'there is

---

[16]When pressed at oral argument, Customs averred that this language only requires the United States to permit a certain access level and because the United States made available the opportunity for importation of the requisite aggregate quantity of ice cream, it fulfilled its duty under Schedule XX.  However, this argument betrays the plain language of the first clause.  See Def.'s Mem. Reply Pl.'s Opp. Def.'s Cross-Mot. Summ. J. at 10 ("Schedule XX, to the contrary, indicates that the aggregate quantity of ice cream must be 'not less than the total quantity specified below'. . . . Schedule XX affirmatively sets forth a minimum aggregate amount of ice cream which may be imported from all countries.").  Moreover, Customs' argument creates tension with the word "entered."  In order for products to be "entered under subheading 2105.00.10," HTSUS, something must occur (i.e., be "entered, or withdrawn from [a] warehouse for consumption, in the customs territory of the United States" pursuant to U.S. Additional Note 19, HTSUS) – not the mere possibility of entry occurring.  Even if the Court were to have any doubt, the canon of liberal construction would apply resolving the ambiguity in favor of the Court's reading.  See infra at 29.

no canon against using common sense in construing laws as saying what they obviously mean.'") (quoting Roschen v. Ward, 279 U.S. 337, 339 (1929)).

That Schedule XX employs the word "shall" demonstrates that the United States agreed to provide not less than this minimum access level.  The word "shall," generally speaking, imposes a requirement.  That this is a mandatory requirement is reinforced when the word "shall" is viewed in contraposition to the Section's later use of the word  "may," i.e., "the Department of Agriculture may regulate."  Cf. Jama v. Immigration and Customs Enforcement, 125 S. Ct. 694, 703 (2005).  Therefore, the plain text of Schedule XX requires that the United States allow 5,191,031 liters into the United States at the reduced tariff rate regardless of whether the enumerated nations have exhausted their reserved allotments.

Customs departs from this common sense reading even though, in its initial briefs to the Court, it maintained that the plain language of Schedule XX conflicted with its interpretation of Note 5, i.e., that Schedule XX required reallocation but Note 5 did not, and therefore there was a conflict between the two.[17]  Customs now

---

[17]In its initial brief Customs argued: "Pillsbury quotes a WTO document referred to as 'Schedule XX' which indicates that the aggregate quantity of ice cream would be 'not less than the total quantity specified below.'  If this language was in Additional U.S. Note 5 to Chapter 21, HTSUS, there would be some merit to Pillsbury's claim.  However, the language in Additional U.S. Note 5 is quite different."  Def.'s Mem. at 12 n.1; see also Def.'s Mem. Reply Pl.'s Opp. Def.'s Cross-Mot. Summ. J. at 10 ("Schedule XX, to the contrary, indicates that the aggregate quantity of ice cream

advances three arguments as to why reallocation is not required. First, Customs alleges that the term "reserved" signals that the United States is not required to reallocate. Second, it argues that the permission to regulate (including reallocation) suggests that reallocation is not required. Third, it submits a correspondence from the Embassy of New Zealand interpreting such provisions. The Court will address each argument in turn.

**1.**

First, Customs points to the word "reserved," i.e., "[o]f the quantitative limitation provided for in this note, an access level is reserved as follows," claiming that the word "reserved" means that Customs is not required to reallocate unused quotas. Citing Webster's Third New international Dictionary of the English Language 1930 (1993), Customs argues that the word "reserved" means "to keep in store for future or special use: hold or keep in reserve . . . to set aside or apart – usu. with to or for . . . ."

---

must be 'not less than the total quantity specified below'. . . . Schedule XX affirmatively sets forth a minimum aggregate amount of ice cream which may be imported from all countries.").

Concerned by Customs' representations in its initial brief, the Court requested that the parties submit supplemental briefs on the question of whether Note 5 and Schedule XX conflicted. The Court permitted a month to submit a ten-page response. Customs twice asked for extensions citing the need to conduct "a significant" amount of research. The six page submission by Customs cited a single authority: the Webster's Third New International Dictionary. Customs failed to even address the "not less than" language of Schedule XX in its supplemental submission to the Court.

Def.'s Supp. Mem. at 5 n.2 (emphasis in original).  As this definition indicates, "reserved" means to keep for a "special use." However, when that "special use" has expired, i.e., the time that the enumerated nations may use their allotments has elapsed, the definition of "reserved" is not implicated.

Moreover, Customs' interpretation departs from the cardinal principle that international agreements should be read holistically.  Air France v. Saks, 470 U.S. 392, 396-97 (1985) ("The analysis must begin . . . with the text of the treaty and the context in which the written words are used"), cf. Koons Buick Pontiac GMC, Inc. v. Nigh,  125 S. Ct. 460, 466-67 (2005). According to this principle, any meaning ascribed to the word "reserved" should, if possible, be read in harmony with the rest of the Section's scheme.  As previously discussed, the plain language requires that the overall aggregate level permitted into the United States be not less than 5,191,031 liters.  Customs' reading of "reserved" would needlessly set the two parts of the Section in tension as it would suggest the aggregate level of actual imported ice cream could be less than 5,191,031 liters.  This reading of "reserved" would also conflict with the word "aggregate," i.e., "[t]here shall be an aggregate quantity" of ice cream admitted into the United States.  The word "aggregate" suggests that all actual entries are considered in determining the TRQ rate – not that the enumerated nations' allotments are hermetically sealed from the

unenumerated nations' allocations. Customs' interpretation ignores this word in the Section.

Customs' argument is further undercut by another claim it makes: that Customs may reallocate unused quotas so long as it is done by regulation. If the term "reserved" had the meaning Customs ascribed to it, then it could not reallocate unused quotas. That Customs agrees that it may reallocate unused quotas undermines the import Customs places on the word "reserved."[18]

**2.**

Next Customs argues that Schedule XX grants the Department of Agriculture ("Agriculture") the authority to "administer through regulations (including licenses and reallocation of the unfilled quotas)" the TRQ. Therefore, Defendant argues, Agriculture must promulgate regulations for reallocation if reallocation is to be allowed – because Agriculture has not promulgated regulations, Defendant asserts, no reallocation is permitted.[19]

---

[18]The Court further notes that when the drafters wanted to make an access level separate from the aggregate level, it stated so explicitly, as Mexico's allotment illustrates. See Schedule XX ("An additional aggregate quantity of 366,000 liters is reserved for Mexico under this note and additional U.S. note 3 to chapter 4 combined.") (emphasis added). Accordingly, where the drafters intended that an enumerated allotment be insulated from access by other nations it used language quite different from the "an access level is reserved" language at issue here.

[19]The Court notes that this language grants Agriculture the authority to establish regulations, not Customs. Therefore, any deference would flow to Agriculture, thereby further undermining Customs' claim for Chevron deference. See Haggar Apparel Co. v.

First, the language on which Customs focuses in no way detracts from, or qualifies, the absolute language of the first clause, i.e., the "shall be permitted" clause.  In essence, Customs reads the "administered through regulations" language as stating that the United States "may <u>only</u>" reallocate through regulation, thereby defeating the mandate of the first clause if no regulation is promulgated.   However, the language admits of no such restriction and the Court will not imply one.[20]

Moreover, contrary to Customs' supposition, the "administered through regulations" language detracts from, rather than supports, its argument.  This conclusion is best evidenced when considered in the context of international trade law.   <u>See, e.g.</u>, <u>Geofroy v. Riggs</u>, 133 U.S. 258, 271 (1890) ("words [of the treaty] are to be taken in their ordinary meaning, as understood in the public law of nations, and not in any artificial or special sense impressed upon them by local law "), <u>The Pizarro</u>, 15 U.S. (2 Wheat.) 227, 243 (1827)(Story, J.).   Generally, under international trade law,

---

<u>United States</u>, 526 U.S. at 388.

[20]The Court further notes that this language is standard disclaimer language found in all of the United States' TRQs which allocate quotas to nations (or groups of nations), including maximum access provisions.  This broad usage reinforces the Court's reading that this language is not intended to derogate rights created by the operative language used in the other portions of the ice cream TRQ. Rather, this usage suggests that the United States wanted the "administered through regulations" language to recognize its use of regulations in adopting license and reallocation provisions of in-quota imports.

nations are always free to grant more liberal trade concessions than those to which they have agreed.  Cf. Schedule XX ("There shall be permitted entry an aggregate quantity of ice cream . . . of not less than the total specified below.").  If a nation so desired, it could eradicate all of its tariffs without violating international law.  However, the reverse is not true – if the United States has agreed to a certain tariff rate, it cannot raise that rate without violating its international agreements.  This principle sheds light on the meaning of the clause upon which Customs relies.  If the United States did not have to reallocate, stipulating that it could reallocate by regulation would be senseless -- of course it could reallocate.  Rather, the sensible reading is that Schedule XX allows the United States to encumber reallocation through regulations established by Agriculture.[21]  Such regulations could, for example, permit Agriculture to provide a procedure for reallocation.[22]

---

[21]The Court further notes that the word "regulation" means "[t]he act or process of controlling by rule or restriction." Black's Law Dictionary 1311 (8th ed. 2004).

[22]As the Supreme Court noted in Geofroy v. Riggs, "the treaty power of the United States extends to all proper subjects of negotiation between our government and the governments of other nations[.]" 133 U.S. at 266.  Under Customs' proposed construction, why the internal allocation of authority of regulatory power of the United States is addressed when the United States already has the full authority to regulate (and prohibit) is left unexplained.  In other words, under Customs' reading, this provision would simply be an attempt by USTR to enlarge Agriculture's authority when the rights of foreign nations were not implicated.  Under such a reading, it is hard to see how the language would have been the proper subject of negotiations between our government and foreign

Even if the Court were to have any doubt, the oft-quoted maxim of liberal construction would counsel in favor of reallocation: if "'a treaty fairly admits two constructions, one restricting, the other enlarging, rights which may be claimed under it, the more liberal interpretation is to be preferred.'" United States v. Stuart, 489 U.S. 353, 368 (1989) (quoting Bacardi Corp. of Am. v. Domenech, 311 U.S. 150, 163 (1940)).  Pursuant to this maxim, the Court should, and does, prefer recognizing that Schedule XX requires reallocation of unused allotments.

**3.**

Last, Customs points to a letter from the Embassy of New Zealand to the United States International Trade Commission, opposing the reallocation of unused in-quota allotments for beef imports and expressing its opinion that the TRQ for beef "is a minimum access opportunity, not an obligation; the United States is not required to import 656,621 tonnes of beef each year."[23]  Letter from Ambassador John Wood, New Zealand, to Chairman, United States International Trade Commission, Re: Cattle and Beef: Impact of the

governments.

    [23]The Court notes that the actual language of the Ambassador's letter appears to address a matter not at issue here, i.e., whether the U.S. may reallocate, and thereby limit, New Zealand's access level if its allotment is not used.  The Court's conclusion here in no way abridges New Zealand's, or any of the enumerated nations' rights, under Schedule XX.  Customs must keep the enumerated nations' access levels open to those nations until the end of the year, and then only reallocate any unused quota for that year.

NAFTA and Uruguay Round Agreements on U.S. Trade (March 13, 1997), Exhibit B to Def.'s Mem.  In its original submissions Customs erroneously cited this authority as bearing on the interpretation of United States' law while, at the same time, arguing that the United States had appropriately departed from its international legal obligations.  When the United States has departed from international norms, constructions of U.S. statutes by foreign governments are wholly irrelevant.  Accord Roper v. Simmons, 125 S. Ct. 1183, 1199-1200 (2005) (looking to international sources to interpret the Eighth Amendment because the Eighth Amendment embraced, rather than conflicted with, international norms).  This is especially true given that courts grant only a modicum of deference to Customs regarding its interpretation of U.S. law – why the Court would be swayed by the position of foreign governments on U.S. law is unclear.

     Nonetheless, reframing of the issue as an interpretation of Schedule XX does make this submission arguably probative.  Courts have long recognized that contract states' post-ratification understanding may be consulted in construing an international agreement.  Zicherman v. Korean Air Lines Co., 516 U.S. 217, 227-28 (1996).  Nevertheless, unilateral actions taken by a single foreign state are rarely persuasive especially when those actions violate the letter and spirit of the international agreement.  Cf. In re Kaine, 55 U.S. (14 How.) 103, 113 (1853) ("What Great Britain has

done by its legislation, cannot control our decision; we must abide by our own laws.  If theirs are inconvenient, or supposed to violate the spirit of the treaty, it is the duty of our government to complain, and ask that they be reformed."); Sullivan v. Kidd, 254 U.S. 433, 442 (1921).  Customs has failed to corroborate its proffered interpretation with any minutes of the Uruguay Round negotiations or any other authoritative source.  Moreover, this position appears contrary to the prior position of our own government, which required reallocation.[24]  See Headquarter Ruling

---

[24]In fact, in 2000, the United States proposed the following before the WTO:

> **Reallocation:** Many TRQ administrative practices, particularly the use of import licenses, do not permit sufficient reallocation to allow exporters to fill TRQs.  The United States proposes that members develop new disciplines on license reallocation, such as requirements that licensees surrender  unused licenses if they cannot arrange shipments within specified time periods. Members would reallocate, in a timely fashion, unused licenses to provide sufficient commercially viable opportunities for other importers, including new entrants.

Proposal for Tariff Rate Quota Reform: Submission from the United States, G/AG/NG/W/58 (Nov. 14, 2000) available at http://docsonline.wto.org/DDFDocuments/t/G/AG/NGW58.doc (last accessed April 15, 2005).  Customs has not submitted any interpretation of the ice cream TRQ, or any other TRQ, by the United States Trade Representative (the Agency charged with negotiating and enforcing other nations' compliance with TRQ's) that may shed light on the TRQ's meaning at issue here.

Letter 962316 (Nov. 5 1998).[25]  Consequently, this submission is unpersuasive.

## C.

Given that Schedule XX unambiguously requires reallocation of unused quotas, the Court now considers whether Note 5 is at odds with this interpretation.  The Court finds that it is not.

Note 5's most significant departure from Schedule XX is that it frames the issue in the negative rather than the positive. Whereas Schedule XX specifies that the United States "shall permit" certain quota levels, Note 5 states that imports "shall not exceed."  The Court does not consider this a meaningful divergence. The only other significant variation is that Note 5 states that enumerated nations shall have "access" to certain allotment whereas Schedule XX says the allotments are "reserved" for the enumerated nations.  Again this variation is immaterial and, if anything, supports the Court's interpretation because "access" is more permissive than the word "reserved."  Certainly, these departures, when read in light of the plain language of Schedule XX, do not render Note 5 ambiguous.

---

[25]Customs attempts to discount this Ruling Letter by asserting that there is a slight variance in the wording between Note 5 and the provision at issue in the Ruling Letter.  Assuming that Customs is correct in noting that the variance in language does not establish this Ruling Letter as clear precedent, then Customs' citation to the New Zealand Letter must also fail as Customs has failed to prove that the language that gave rise to the letter is identical to the provision in question here.

Therefore, upon application of the canon of constitutional avoidance and the <u>Charming Betsy</u> canon, the Court incorporates the unambiguous interpretation of Schedule XX into the meaning of Note 5. Consequently, the Court deems that Note 5 requires Customs to reallocate the unused quotas of the enumerated nations.

## IV. CONCLUSION

For the foregoing reasons, the Court deems that Note 5 requires Customs to reallocate unused quotas. Accordingly, Plaintiff's motion for summary judgment is granted and Defendant's motion for summary judgment is denied.

_____/s/_____
Donald C. Pogue
Judge

Dated:    New York, New York
          April 19, 2005

ERRATUM


     <u>The Pillsbury Company v. United States</u>, Slip Op. 05-51, April 19, 2005, Court No. 03-00096:

    Page 2: "USCIT R. 56©)" should be "USCIT R. 56(c)"

    Page 4 footnote 4: "19 U.S.C. § 3004©)" should read "19 U.S.C. § 3004(c)"

April 20, 2005